# In the United States Court of Federal Claims

No. 08-899C
(Filed: July 26, 2016)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MICHAEL SABO, NICHOLAS WELLS, | \* |
| JUAN PEREZ, ALAN PITTS, BILLY J. | \* |
| TALLEY, AIMEE SHERROD, and | \* |
| TYLER EINARSON on behalf of | \* |
| themselves and all other individuals | \* |
| similarly situated, | \* |
| | \* |
| Plaintiffs, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| | \* |
| Defendant. | \* |

Application for Attorneys' Fees and
Expenses Under the EAJA; Antiassignment
Act; Prevailing Party; Substantial
Justification; Application of VASRD
§ 4.129 to Service Members Discharged
With PTSD; 10 U.S.C. Chapter 61;
Adequacy of Supporting Documentation

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Brad Fagg and Barton F. Stichman, Washington, DC, for plaintiffs.

Douglas K. Mickle, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiffs, and the members of the class they represent, were medically separated from the United States military due to posttraumatic stress disorder ("PTSD") resulting from their service in Iraq and Afghanistan during Operation Iraqi Freedom and Operation Enduring Freedom. In conjunction with their separations, the military assigned them disability ratings for their PTSD of less than 50%. Contending that they were entitled to disability ratings of 50% for their PTSD under federal law, plaintiffs filed suit to obtain the higher disability rating and the benefits that would flow from that higher rating. The parties ultimately reached a settlement. Now before the court are plaintiffs' applications for attorneys' fees and expenses. As explained below, the court grants plaintiffs' applications in their entirety and awards plaintiffs attorneys' fees and expenses in the amount of $3,862,924.53.

# I. BACKGROUND

To place the issues raised in plaintiffs' applications for attorneys' fees and expenses in the proper context, the court provides the following pertinent background information, beginning with an overview of the military's disability evaluation system.[1]

## A. The Military's Disability Evaluation System

When a physical disability renders a member of the military unfit to perform his or her duties, the member may be separated or retired from service. 10 U.S.C. ch. 61 (2000). A service member's fitness for duty and eligibility for separation or retirement is governed by regulations promulgated by the Secretary of the military department to which the service member belongs.[2] Id. § 1216. Specifically, these regulations are issued by the Secretaries of the United States Department of the Air Force, the United States Department of the Army ("Army"), and the United States Department of the Navy. See Air Force Instruction 36-3212, Physical Evaluation for Retention, Retirement, or Separation (Sept. 30, 1999); Army Regulation 635-40, Physical Evaluation for Retention, Retirement, or Separation (Aug. 15, 1990); Secretary of the Navy Instruction 1850.4E, Department of the Navy (DON) Disability Evaluation Manual (Apr. 30, 2002).

The military's disability evaluation process begins with a medical evaluation by a Medical Evaluation Board ("MEB").[3] DoDI 1332.38, ¶¶ E3.P1.1.1, E3.P1.2. The MEB documents the service member's medical condition, id. ¶ E3.P1.2.3, and then, if the service member has a duty-related impairment, refers the service member to a Physical Evaluation Board ("PEB"), id. ¶ E3.P1.2.7.

PEBs conduct physical disability evaluations to determine "the fitness of Service members with medical impairments to perform their military duties[.]" Id. ¶ E3.P1.3.1. If a PEB determines that a service member is unfit for duty, it must document, among other things, "[t]he

---

[1] The court derives the background information from the relevant statutes, regulations, and memoranda, as well as from the documents filed on the case's docket.

[2] Under 10 U.S.C. § 1216, the "Secretary concerned" is responsible for promulgating the regulations for his or her military department. See 10 U.S.C. § 101(a)(9) (defining "Secretary concerned" as either the "Secretary of the Army," the "Secretary of the Navy," the "Secretary of the Air Force," or the "Secretary of Homeland Security"). However, the United States Department of Defense ("Department of Defense") has also promulgated relevant regulations.

[3] For simplicity, the court derives its description of the military's disability evaluation system from Department of Defense Instruction ("DoDI") 1332.38, Physical Disability Evaluation (Nov. 14, 1996), rather than from the regulations promulgated by the Secretaries of the military departments.

code and percentage rating assigned an unfitting physical disability in accordance with the [Schedule for Rating Disabilities ("VASRD") promulgated by the United States Department of Veterans Affairs ("VA")]."[4]  Id. ¶ E3.P1.3.4.1.2; accord id. ¶ E3.P4.6 ("When a disability is established as compensable, the disability shall be rated according to the VASRD, as implemented by [DoDI] 1332.39 . . . and federal law.").  The PEB must also determine an unfit service member's "entitlement to benefits under Chapter 61 of 10 U.S.C."  Id. ¶ E3.P1.3.1.

A case referred by an MEB is considered first by an informal PEB.  Id. ¶ E3.P1.3.2.  Upon receiving an informal PEB's findings and recommendations, a service member is counseled by a PEB liaison officer, who is charged with advising the service member "of the significance and consequences of the determinations made and the associated rights, benefits, and entitlements."  Id. ¶ E3.P1.4.1.  A service member may either accept the informal PEB's findings and recommendations or demand a formal PEB.  Id. ¶¶ E3.P1.3.3, E3.P1.3.3.1.1.1.  If a service member accepts the decision of the informal PEB and waives a formal PEB, that decision must be documented by the PEB liaison officer.  Id. ¶ E3.P1.3.3.

Once the PEB documents its findings and recommendations, a service member's case is referred to the final reviewing authority within the relevant military department for a final determination.  Id. ¶¶ E3.P1.5.2.1, E3.P1.6.3; accord id. ¶ E3.P7.1.  The case is then sent to the military department's personnel office for final disposition.  Id. ¶ E3.P1.5.  Final dispositions include permanent retirement, placement on the temporary disability retirement list ("TDRL"), and separation.  Id. ¶ E3.P7.5 (citing 10 U.S.C. §§ 1201-1206).

## B. The VASRD and PTSD Disability Ratings in the Military's Disability Evaluation System

### 1. The Pre-2008 Statutory and Regulatory Framework

Prior to 2008, a service member with at least thirty days of active duty service who was deemed unfit for duty could be permanently retired pursuant to 10 U.S.C. § 1201, placed on the TDRL pursuant to 10 U.S.C. § 1202, or separated pursuant to 10 U.S.C. § 1203.  If the Secretary of the relevant military department determined that the service member's "disability [was] at least 30 percent under the standard schedule of rating disabilities in use by the [VA] at the time of the determination," the service member could be permanently retired, 10 U.S.C. § 1201(b)(3)(B), or placed on the TDRL, id. § 1202 (incorporating the standards set forth in 10 U.S.C. § 1201).  If the relevant Secretary determined that the service member's "disability [was] less than 30 percent under the standard schedule of rating disabilities in use by the [VA] at the time of the determination," the service member could be separated.  Id. § 1203(b)(4)(A)-(B); see also id. § 1203(b)(4)(C) (noting that separation was possible in certain circumstances if a

---

[4]  "The term 'physical disability' includes mental disease, but not such inherent defects as behavioral disorders, adjustment disorders, personality disorders, and primary mental deficiencies."  DoDI 1332.38, ¶ E2.1.25.

soldier's "disability [was] at least 30 percent under the standard schedule of rating disabilities in use by the [VA] at the time of the determination"). In short, the military was statutorily required to use the VASRD to determine the disability ratings of service members with medical conditions rendering them unfit for duty.[5] Accord DoDI 1332.39, Application of the Veterans Administration Schedule for Rating Disabilities ¶ 4.2 (Nov. 14, 1996) ("Chapter 61 of [10 U.S.C.] establishes the [VASRD] as the standard for assigning percentage ratings.").

The VASRD contains two provisions that specifically address PTSD. VASRD § 4.129 provides:

> Mental disorders due to traumatic stress
>
> When a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about the veteran's release from active military service, the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the six month period following the veteran's discharge to determine whether a change in evaluation is warranted.

38 C.F.R. § 4.129 (2002).[6] And, VASRD § 4.130 sets forth the schedule for rating mental disorders, including PTSD; in other words, it provides guidance for assigning 10%, 30%, 50%, 70%, and 100% disability ratings. Id. § 4.130.

Although the military was statutorily required to use the VASRD to determine disability ratings, the Department of Defense recognized that some of the provisions of the VASRD were not applicable to the military's performance of this task. Specifically, it noted:

> [N]ot all the general policy provisions in Sections 4.1 - 4.31 of the VASRD are applicable to the Military Departments. . . . [DoDI 1332.39] replaces these sections of the VASRD. The remainder of the VASRD is applicable except those portions that pertain to [VA] determinations of Service connection, refer to

---

[5] Other sections of the pre-2008 version of chapter 61 of title 10 of the United States Code contain language similar to the language appearing in sections 1201 and 1203 directing the military to use the VASRD to determine disability ratings. See, e.g., 10 U.S.C. §§ 1204(4)(B), 1206(5), 1210(c)-(e).

[6] The court cites to the 2002 version of the VASRD because it was the version in effect six years prior to the filing of the complaint in this case. The sections of the VASRD discussed in this Opinion and Order were not substantively amended between 2002 and December 17, 2008, the date that plaintiffs filed their complaint.

internal [VA] procedures or practices, or are otherwise specifically identified in Enclosure 2 [of DoDI 1332.39] as being inapplicable.

DoDI 1332.39, ¶ 4.2.

One of the "general policy provisions" that the Department of Defense deemed inapplicable to the military concerned convalescent ratings.  VASRD § 4.30 provides:

Convalescent ratings.

A total disability rating (100 percent) will be assigned without regard to other provisions of the rating schedule when it is established by report at hospital discharge (regular discharge or release to non-bed care) or outpatient release that entitlement is warranted under paragraph (a) (1), (2) or (3) of this section effective the date of hospital admission or outpatient treatment and continuing for a period of 1, 2, or 3 months from the first day of the month following such hospital discharge or outpatient release.  . . .

(a)  Total ratings will be assigned under this section if treatment of a service-connected disability resulted in:

(1)  Surgery necessitating at least one month of convalescence.  . . .

(2)  Surgery with severe postoperative residuals . . . .

(3)  Immobilization by cast, without surgery, of one major joint or more.

38 C.F.R. § 4.30.  In addition, convalescent ratings related to mental disorders are addressed in VASRD § 4.128:

Convalescence ratings following extended hospitalization.

If a mental disorder has been assigned a total evaluation due to a continuous period of hospitalization lasting six months or more, the rating agency shall continue the total evaluation indefinitely and schedule a mandatory examination six months after the veteran is discharged or released to nonbed care.

Id. § 4.128.  The Department of Defense specifically rejected the use of convalescent ratings in DoDI 1332.39:

Under certain diagnostic codes, the VASRD provides for a convalescent rating to be awarded for specified periods of time without regard to the actual degree of impairment of function.  SUCH RATINGS DO NOT APPLY TO THE

-5-

MILITARY DEPARTMENTS.  Convalescence will ordinarily have been
completed by the time optimum hospital improvement (for disposition purposes)
has been attained.  If not, rate according to the manifest impairment.

DoDI 1332.39, ¶ 6.7.

The parties have not identified, and the court could not locate, any military regulations
deeming VASRD § 4.129 to be a convalescent rating.  However, in 2002 and 2005, the Army
issued substantially identical policy memoranda to the presidents of its PEBs in which it declared
that the 50% disability rating set forth in VASRD § 4.129 was a convalescent rating and that,
therefore, it would not use VASRD § 4.129 when assigning disability ratings to soldiers deemed
unfit for duty due to PTSD.  See United States Army Physical Disability Agency, Memorandum
for Physical Evaluation Board Presidents, Policy/Guidance Memorandum #7:  The Department
of Veterans Affairs Schedule for Rating Disabilities (VASRD) Ratings for Mental Disorders,
Narcolepsy, and Sleep Apnea Syndrome, Enclosure 1, ¶ 1(e) (Feb. 25, 2005) ("The Army does
not use convalescent ratings.  Paragraph 4.129 . . . is essentially a convalescent rating and will
not be used."); United States Army Physical Disability Agency, Memorandum for Physical
Evaluation Board Presidents, Policy/Guidance Memorandum #7:  The Department of Veterans
Affairs Schedule for Rating Disabilities (VASRD) Ratings for Mental Disorders, Narcolepsy,
and Sleep Apnea Syndrome ¶ 4(a)(5) (Apr. 8, 2002) (same).  It further bears noting that the
Department of Defense distinguished convalescent ratings from observation ratings and
minimum ratings, both of which the military departments would apply in the appropriate
circumstances.  See DoDI 1332.39, ¶¶ 6.8 (indicating that observation ratings apply to the
military departments), 6.10.2 ("In some instances the VASRD provides a 'minimum rating'
without qualifications as to residuals or impairment.  Diagnosis alone is sufficient to justify the
minimum rating.  . . .  Although higher ratings may be awarded in consonance with degree of
severity, no rating lower than the 'minimum' may be used if the diagnosis is satisfactorily
established.").

## 2.  The National Defense Authorization Act for Fiscal Year 2008 and Related Regulations

On January 28, 2008, Congress enacted the National Defense Authorization Act for
Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3 ("2008 NDAA").  Title XVI of that Act was
the Wounded Warrior Act, id. § 1601, 122 Stat. at 431, in which Congress, among other things,
directed the Secretaries of the VA and the Department of Defense to "develop a policy on
improvements to the processes, procedures, and standards for the conduct of physical disability
evaluations of recovering service members by the military departments and by the [VA]," id.
§ 1612(b)(1), 122 Stat. at 422.  The policy was to be developed by July 1, 2008, id., and to
include the following:

[P]rocedures to eliminate unacceptable discrepancies and improve consistency
among disability ratings assigned by the military departments and the [VA],

particularly in the disability evaluation of recovering service members, which procedures shall be subject to the following requirements and limitations:

> . . . .

> > (ii)  Under such procedures, each Secretary of a military department shall, to the extent feasible, utilize the standard schedule for rating disabilities in use by the [VA] . . . .

Id. § 1612(b)(2)(B), 122 Stat. at 422.  In conjunction with this provision, Congress added a new section to chapter 61 of title 10 of the United States Code–10 U.S.C. § 1216a.  Id. § 1642, 122 Stat. at 465.  The new section provided:

> Utilization of VA Schedule for Rating Disabilities in Determinations of Disability.–

> (1)  In making a determination of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned–

> > (A)  shall, to the extent feasible, utilize the schedule for rating disabilities in use by the [VA], including any applicable interpretation of the schedule by the United States Court of Appeals for Veterans Claims; and

> > (B)  except as provided in paragraph (2), may not deviate from the schedule or any such interpretation of the schedule.

10 U.S.C. § 1216a(a) (2012).  Finally, Congress created the Physical Disability Board of Review ("PDBR"), which was charged with reviewing the findings and decisions of PEBs for former service members who were medically separated from service between September 11, 2001, and December 31, 2009, with a disability rating of 20% or less.  Pub. L. No. 110-181, § 1643, 122 Stat. at 465-67 (codified at 10 U.S.C. § 1554a).

On October 14, 2008, the Department of Defense issued a policy memorandum regarding implementation of the Wounded Warrior Act.  See Under Secretary of Defense for Personnel and Readiness, Memorandum for Secretaries of the Military Departments et al., Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act of 2008 (Pub. L. 110-181) (Oct. 14, 2008).  With this memorandum, the Department of Defense rescinded DoDI 1332.39–pertaining to the military's application of the VASRD–and directed the military departments to prospectively apply VASRD § 4.129 to service members deemed unfit for duty due to PTSD.  Id. ¶ E7.2 ("The Military Department Secretary concerned will abide by 10 USC 1216a and 38 CFR 4.129, VASRD for disposition of Service members found unfit because of a mental disorder due to traumatic stress.").

The Department of Defense issued another memorandum on July 17, 2009, to clarify how the PDBR should apply VASRD § 4.129 to former service members seeking a review of their disability ratings (in other words, the retroactive application of VASRD § 4.129). See Office of the Under Secretary of Defense for Personnel and Readiness, Memorandum for Secretary of the Army et al., Requests for Correction of Military Records Relating to Disability Ratings for Post Traumatic Stress Disorder (July 17, 2009). That memorandum provided:

> [DoDI] 6040.44 . . . directs the PDBR in reviewing prior disability ratings to disregard any Military Department guidelines that were inconsistent with the VASRD. While reliance on section 4.130, rather than section 4.129, was arguably consistent with the VASRD, the PDBR has concluded that equity favors giving applicants the benefit of section 4.129. Consultations with the [boards for correction of military records ("BCMRs")] indicate recognition of the desirability of consistency among the BCMRs and PDBR in adjudicating these cases.

> Therefore, as a matter of policy, the PDBR and all three BCMRs will apply VASRD Section 4.129 to PTSD unfitting conditions for applicants discharged after September 11, 2001, and in such cases, where a grant of relief is appropriate, assign a disability rating of not less than 50% for PTSD unfitting conditions for an initial period of six months following separation, with subsequent fitness and PTSD ratings based on the applicable evidence.

Id. at 1-2.

## C. Procedural History

### 1. The Complaint and Initial Attempts to Administratively Resolve the Claims of Plaintiffs and the Class Members

As previously noted, plaintiffs served in Iraq and Afghanistan and were subsequently diagnosed with PTSD. As a result, they were deemed unfit for duty and medically separated from their respective service branches. In accordance with the military's interpretation of the regulations then in effect, all were assigned disability ratings of less than 50% for their PTSD.

Believing that their assigned disability ratings were contrary to law, plaintiffs, on December 17, 2008, filed suit in this court on behalf of themselves and other similarly situated individuals. They sought to enjoin the military's practice of disregarding the VASRD when assigning disability ratings for PTSD, and requested the disability retired pay and other benefits that they would have received had they been assigned a 50% disability rating for their PTSD as required by chapter 61 of title 10 of the United States Code and the VASRD.

Defendant did not immediately file an answer to plaintiffs' complaint. Instead, during a June 12, 2009 status conference, it proposed certain administrative procedures and policy

changes to resolve plaintiffs' claims.  It also represented that its goal was to provide former service members with "expeditious" relief.  Status Conference Tr. 29-30, June 12, 2009.  As the parties were discussing defendant's proposal, plaintiffs filed an amended complaint to add two plaintiffs on September 2, 2009, and on September 21, 2009, the court granted plaintiffs' unopposed motion to certify the case as a class action and appoint attorneys from the law firm of Morgan, Lewis & Bockius, LLP ("Morgan Lewis") and the National Veterans Legal Services Program ("NVLSP") as class counsel.  The parties ultimately reached an agreement regarding the procedure for resolving plaintiffs' and the class members' claims, as reflected by their agreed-upon Notice of Class Action that was approved by the court on December 18, 2009:

> If you join this lawsuit, you will be given the opportunity to, but are not required to, apply for a prioritized review by a military records correction board . . . .  You will be sent a preformatted application requesting assignment of higher rating(s) for PTSD than you received from the PEB.

> If you file the application described in the prior paragraph, the board will correct your military records to show that your disability rating for PTSD was at least 50% for the six-month period following the date you were released from the service.  In addition, the board will determine whether–between the date six months after your release from the service to the date of the board's review–your PTSD disability rating of at least 50% should be increased, decreased, or remain the same, but absent fraud or unforeseen circumstances, your application will not result in the board reducing the PTSD rating(s) that the PEB previously assigned to you.  In other words, you cannot end up with lower disability ratings for PTSD by joining this lawsuit and applying for prioritized review . . . .

> If you were medically separated or permanently retired by the PEB, then the PTSD rating assigned by the military records correction board for the later period (that is the date six months after your release to the date of the board's decision) will be a permanent disability rating for PTSD.

> If you are currently on the [TDRL], and you join this lawsuit and file your application for prioritized review, the military records correction board cannot take you off the TDRL and separate you without giving you permanent disability retirement benefits.

Order Ex. 1 at 4-5, Dec. 18, 2009.  The Notice also contained more detailed information regarding the records correction process:

> If you join this lawsuit, you will be sent a special preformatted application form for use in applying to one of two military records correction boards – the [PDBR] or the [BCMR] of the service branch in which you served.  Included with the application will be written advice from the lawyers who represent the veterans

in this lawsuit about to which of the boards you should apply, and how to complete the application form to receive prioritized review.

After the board receives your application, it will obtain the medical records that were reviewed by the PEB in your case.  If you have already applied for VA benefits and consent to the release of your VA records, the board may obtain from the VA a copy of the records that are in your VA claims file. . . .  In addition, you may submit evidence about your PTSD that may not be in your PEB or VA claims file.

You will not have to travel to appear before the board, and the board will not hold a hearing.  The board will make a decision based on the records described above and any documents you may submit.

Id. at 5.  In addition to describing the claim resolution procedure, the Notice addressed the payment of attorneys' fees and expenses:

How will the lawyers be paid?

[Class Counsel] are representing the veterans who filed this lawsuit and those who decide to join this lawsuit without charging any of these veterans any money.  However, if Class Counsel obtains money or benefits for any of these veterans, they may ask the Court to order the government to pay their fees and expenses.  Under no circumstances will any of these fees and expenses come from the money or benefits to which you may become entitled as a result of this lawsuit.

Id. at 8; see also id. at 2 ("The veterans who filed this lawsuit seek a Court Order requiring the military services . . . to pay the lawyers who represent the veterans who filed this lawsuit their expenses and fees associated with bringing and prosecuting this lawsuit (and without payment of any money by them or those who join this lawsuit) . . . .").  The court thereafter stayed proceedings until February 3, 2011, to allow the approximately 4300 notified individuals to opt-in to the class and obtain relief from the PDBR or a BCMR, a process both parties agreed would be "expedited" in nature.  Pls.' Mot. to Lift Stay Ex. A at 2, 6, Jan. 28, 2011.

During the pendency of the stay of proceedings, plaintiffs became dissatisfied with the pace at which the PDBR was adjudicating the applications of the more than 2100 class members, notwithstanding defendant's representation that it established "the processes necessary to expedite review of the class members' applications" to allow for "the boards to complete adjudications at a faster pace . . . ."[7]  Joint Status Report 2, June 21, 2010; see also id. at 3

---

[7]  Although the number of class members fluctuated as the case progressed, as of the filing of the parties' most recent status report on July 14, 2016, there were, including plaintiffs,

(indicating defendant's "hope[] that the average processing time for a <u>Sabo</u> class-member's application to move through the [processes] to be approximately five months on average[,] a considerable improvement over the typical 10-month average time it takes for non-<u>Sabo</u> cases to be processed."). They further believed that some of the BCMR decisions were improper. Thus, on January 28, 2011, plaintiffs filed a motion to lift the stay of proceedings and a motion for summary judgment. The court granted plaintiffs' motion to lift the stay on February 14, 2011.

### 2. The Settlement

Upon the lifting of the stay of proceedings, the parties resumed their settlement discussions. Shortly thereafter, on March 11, 2011, they jointly requested that proceedings again be stayed to accommodate their negotiations. The court granted the parties' request, and proceedings remained stayed until July 15, 2011, when the parties filed a proposed "Settlement Agreement and Stipulation and Order of Dismissal."

Paragraph six of the proposed settlement agreement contained the general settlement framework:

Within six months of the date on which the Court approves this Settlement Agreement, defendant shall take all steps necessary to execute the following actions:

(i) in the case of a class member who was separated or retired without being placed on the TDRL, change the military records of each such class member . . . so that they reflect (a) the member was placed on the TDRL and assigned a disability rating for PTSD of 50%, effective for the six-month period beginning on the date the member was released from active service, and (b) the member was taken off the TDRL, and assigned the permanent disability rating for PTSD listed in the applicable exhibit [attached to the settlement agreement], effective six months after the member was released from active service; or,

(ii) in the case of a class member who was placed on the TDRL, change the military records so that they reflect that the member was assigned a disability rating for PTSD of 50 percent, effective continuously for the TDRL period; and

(iii) in the case of a class member who was found to have an unfitting condition other than PTSD prior to release from active service, change the military records of that class member to reflect a combined disability rating for the member's unfitting conditions that takes into account the changes in the disability rating for PTSD made pursuant to subsection (i) or (ii) of this paragraph; and

---

2175 class members.

(iv)  transmit a copy of the changed military records . . . to (a) the class
member, (b) counsel for the plaintiff class, and (c) the Defense Finance and
Accounting Service . . . .

Settlement Agreement ¶ 6, July 15, 2011.  Paragraphs seven through nineteen of the proposed
settlement agreement contained language that divided the class members into nine groups based
on certain shared characteristics (severance pay versus retired pay, placement on the TDRL,
receipt of a decision from the PDBR or a BCMR),[8] and described how the general settlement
framework would be applied to each group.  Of note, 1052 class members would receive lifetime
military disability retirement pay and benefits without needing to secure a decision from the
PDBR or a BCMR;[9] 893 class members already receiving military disability retirement pay and
benefits would have their PTSD disability rating increased to 50% without needing to secure a
decision from the PDBR or a BCMR;[10] and 553 class members who had already obtained a
decision from the PDBR or a BCMR would have the opportunity to reject that decision and
obtain the relief provided for in the settlement agreement.[11]  Also of note, the parties identified
approximately 517 class members who might be affected by an anomaly in the statutory formula
for Combat-Related Special Compensation; paragraph twenty-six of the proposed settlement
agreement provided a detailed mechanism to ensure that the affected class members would not
see a reduction in pay as a result of the settlement.

The parties framed their proposed settlement agreement to ensure that the court would
retain jurisdiction over the claims of a plaintiff or class member until the parties "submit[ted] to
the Court a joint status report that lists . . . the names of those plaintiffs whose military records
have been changed pursuant to the agreed upon terms [set forth in paragraphs one through
nineteen.]"  Id. ¶ 20.  At that time, the court would dismiss the individual's claims with prejudice
in an order of dismissal that contained "a provision incorporating the terms of [the] Settlement
Agreement . . . ."  Id.  The proposed settlement agreement also contained provisions (1) allowing
class members who were awarded disability retirement to obtain reimbursement of past medical
expenses that they and their families incurred upon the class member's separation from the
military and (2) incorporating the procedures for recouping severance pay set forth in chapter 4
of volume 7B of the Department of Defense Financial Management Regulation ("DoD 700.14-
R").  Finally, the proposed settlement agreement provided:  "The terms of this Settlement

---

[8]  The members of each group were set forth in exhibits C, D, E, F, G, H, J, K, and L to
the settlement agreement.  The court derives the number of members of each group from the
information provided by the parties in their most recent joint status report.  See supra note 7.

[9]  These class members were included in exhibits C and D to the settlement agreement.

[10]  These class members were included in exhibits G and H to the settlement agreement.

[11]  These class members were included in exhibits D, F, H, and K to the settlement
agreement.

Agreement are adopted as an order of the Court, are contractual and not merely a recital, and shall be binding upon and inure to the benefit of the parties to it." Id. ¶ 33.

As required by Rule 23(e) of the Rules of the United States Court of Federal Claims ("RCFC"), the court directed that notice of the proposed settlement be sent to all class members and then conducted a fairness hearing. Ultimately, in a December 22, 2011 Opinion and Order, the court granted the parties' joint motion for final approval of the settlement agreement and approved the settlement as "fair, reasonable, and adequate." Sabo v. United States, 102 Fed. Cl. 619, 630 (2011); see also id. at 625 ("When the proposed settlement is implemented, each class member will receive relief . . . ."). The court specifically stated that it would "retain jurisdiction over the claims in [the] case in order to ensure the settlement's implementation." Id. at 630. And, after directing the parties to file periodic joint status reports regarding the implementation of the settlement, the court concluded its Opinion and Order with the statement "it is so ordered." Id.

Upon the court's approval of the settlement agreement, the military departments began correcting the records of the class members in accordance with the terms of the agreement. Unfortunately, a number of issues arose that delayed full implementation of the settlement.[12] Eventually, on February 6, 2013, plaintiffs filed a motion for judicial enforcement of the settlement agreement, which addressed defendant's delay in paying monetary benefits to approximately 950 members of the class. Plaintiffs filed a second motion for judicial enforcement of the settlement agreement on March 14, 2013, which addressed defendant's delay in paying monetary benefits to approximately 1050 other class members. Defendant did not file a response to either of the two motions. Instead, as reflected in an April 29, 2013 joint status report, the parties reached an agreement regarding the relief that plaintiffs sought in their two motions. Pursuant to that agreement, the parties began to submit the names of the class members whose claims could be dismissed from the lawsuit. The court dismissed the claims of the first group of class members on May 9, 2013. In every order dismissing class member claims, the court noted that the parties requested the entry of "an order dismissing [the] claims with prejudice and incorporating the terms of the parties' settlement agreement," and accordingly ordered that the claims be "dismissed with prejudice subject to the terms of the settlement agreement." See, e.g., Order, May 9, 2013. As of the date of this Opinion and Order, the claims of only a single class member remain outstanding.

### 3. Plaintiffs' Applications for Attorneys' Fees and Expenses

On October 10, 2012, while the parties were working to implement the settlement, plaintiffs filed their initial application for attorneys' fees and expenses ("fee application"), seeking reimbursement for fees and expenses incurred through October 31, 2011. Specifically, plaintiffs requested $498,414.74 in attorneys' fees and $12,161.37 in expenses for the work

---

[12] The court recognizes that the parties disagreed as to what precisely was required pursuant to the terms of the settlement agreement.

performed by Morgan Lewis, and $1,467,303.16 in attorneys' fees and $43,403.33 in expenses
for the work performed by the NVLSP. Defendant responded by moving for the dismissal of
plaintiffs' fee application as untimely. In a May 1, 2013 Opinion and Order, the court denied
defendant's motion and directed defendant to respond to the merits of plaintiffs' fee application.
Plaintiffs refiled their fee application on May 16, 2013, defendant responded on June 10, 2013,
and plaintiffs filed a reply–in which they reduced their request for attorneys' fees by
$33,253.12–on July 30, 2013.[13] At the close of briefing, the claims of approximately 1073 class
members had not been dismissed from the lawsuit.

Eventually, on February 2, 2015, plaintiffs filed a motion to supplement and finalize their
fee application ("supplemental fee application"). In their motion, plaintiffs sought
reimbursement for attorneys' fees and expenses incurred from November 1, 2011, through
January 15, 2015, and represented that they were waiving any rights to seek reimbursement for
attorneys' fees and expenses incurred after January 15, 2015. Specifically, plaintiffs requested an
additional $209,883.60 in attorneys' fees and $3795.13 in expenses for the work performed by
Morgan Lewis, and an additional $1,619,449.74 in attorneys' fees and $41,766.58 in expenses
for the work performed by the NVLSP. Defendant responded to plaintiffs' motion on April 8,
2015, and plaintiffs filed a reply on May 29, 2015. Then, at the court's request, the parties filed
status reports addressing the existence of additional authority. Plaintiffs' request for attorneys'
fees and expenses is fully briefed, and the court deems oral argument unnecessary.

## II. THE EQUAL ACCESS TO JUSTICE ACT

Plaintiffs seek an award of attorneys' fees and expenses pursuant to section 204(a) of the
Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2012). "The clearly stated objective of
the EAJA is to eliminate financial disincentives for those who would defend against unjustified
governmental action and thereby to deter the unreasonable exercise of Government authority."
Ardestani v. INS, 502 U.S. 129, 138 (1991). Thus, the EAJA specifies:

> Except as otherwise specifically provided by statute, a court shall award to a
> prevailing party other than the United States fees and other expenses . . . incurred
> by that party in any civil action (other than cases sounding in tort) . . . brought by
> or against the United States in any court having jurisdiction of that action, unless
> the court finds that the position of the United States was substantially justified or
> that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). Additionally, an individual seeking an award of attorneys' fees and
expenses under the EAJA must establish that his or her net worth did not exceed $2,000,000 at
the time the lawsuit was filed. Id. § 2412(d)(2)(B).

---

[13] While the parties were briefing plaintiffs' fee application, the case was transferred
from the Honorable George W. Miller to the undersigned.

In short, to grant an application for attorneys' fees and expenses under the EAJA, the court must find that the applicant satisfies the net worth requirement, that the applicant qualifies as a prevailing party, that the position of the United States is not substantially justified, and that no special circumstances render an award of attorneys' fees and expenses unjust.  Moreover, because the EAJA constitutes a waiver of sovereign immunity, each of these requirements must be satisfied.  See Fid. Constr. Co. v. United States, 700 F.2d 1379, 1386 (Fed. Cir. 1983) ("Although the EAJA lifts the bar of sovereign immunity for award of fees in suits brought by litigants qualifying under the statute, it does so only to the extent explicitly and unequivocally provided."); id. at 1387 (noting that "great care must be taken not to expand liability [for attorneys' fees and expenses] beyond that which was explicitly consented to by Congress"); accord Ardestani, 502 U.S. at 137 ("The EAJA . . . amounts to a partial waiver of sovereign immunity.  Any such waiver must be strictly construed in favor of the United States.").

## III.  PLAINTIFFS' ENTITLEMENT TO AN AWARD OF ATTORNEYS' FEES AND EXPENSES

### A. The Antiassignment Act Does Not Bar Plaintiffs' Fee Application

Before the court can determine whether the requirements of the EAJA have been satisfied in this case, it must address defendant's contention that plaintiffs' fee application is barred by what is commonly referred to as the Antiassignment Act.  The Antiassignment Act provides that an assignment of a claim, or an interest in a claim, against the United States "may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."  31 U.S.C. § 3727(b) (2012).  Defendant's argument is premised on an exchange that occurred during the briefing of its motion to dismiss plaintiffs' fee application.  In their fee application, plaintiffs state:  "Fees received by Plaintiffs will be passed along to their counsel.  With respect to fees due Morgan Lewis, such fees will be donated to charitable and legal services organizations (including NVLSP), in accordance with the policy set forth in the American Bar Association's Model Rules of Professional Conduct."  Fee Appl. 24.  Based on this statement, defendant, in a footnote in its motion to dismiss plaintiffs' fee application, expressed its concern that plaintiffs' fee application may not be proper:

> [W]e also question whether [the fee application] even qualifies as an attorney fee application.  The source of our concern is the application itself, which states that it is not being filed to recoup attorney fees (indeed counsel worked pro bono) but to fund a contribution to "charitable and legal services organizations" of the attorneys' choosing.[]  However, the clear language of the EAJA statute provides that attorney fees are paid to the prevailing party, not the attorney.

Mot. to Dismiss 6 n.4 (citation omitted).  In response, plaintiffs stated that defendant's concern was unwarranted because "the retention arrangements in this case include assignment provisions regarding fee awards."  Resp. to Mot. to Dismiss 13.  From this statement, and the fact that

attorneys' fees under the EAJA belong to the prevailing party, defendant concludes that plaintiffs have violated the Antiassignment Act.

As defendant correctly notes, under the EAJA, attorneys' fees and expenses are to be awarded to the prevailing party, and not the party's attorneys. 28 U.S.C. § 2412(d)(1)(A); <u>Astrue v. Ratliff</u>, 560 U.S. 586, 591-93 (2010). Defendant is also correct when it avers that a party cannot, prior to a claim's resolution, assign an interest in the claim to its attorneys as payment for their services. 31 U.S.C. § 3727(b); <u>Nutt v. Knut</u>, 200 U.S. 12, 20 (1906) (holding that a party's agreement with her attorney that the attorney would have a lien upon her claim against the United States to ensure the payment of the his fees violated the Antiassignment Act, and explaining: "In giving that lien from the outset, before the allowance of the claim, and before any services had been rendered by the attorney, the contract, in effect, gave him an interest or share in the claim itself and in any evidence of indebtedness issued by the government on account of it. In effect or by its operation it transferred or assigned to the attorney, in advance of the allowance of the claim, such an interest as would secure the payment of the fee stipulated to be paid. All this was contrary to the statute[.]"); <u>Kearney v. United States</u>, 285 F.2d 797, 800 (Ct. Cl. 1961) ("[A] contract between an attorney and a client which gives the attorney an interest in the client's claim against the Government is exactly what the anti-assignment statute forbids.").

However, courts have long recognized that certain types of agreements between parties and their attorneys do not violate the Antiassignment Act. For example, in <u>Nutt</u>, the United States Supreme Court ("Supreme Court") held that a party's agreement to pay her attorney one third of the amount recovered on her claim against the United States did not violate the Antiassignment Act because the "agreement did not give the attorney any interest or share in the claim itself, nor any interest in the particular money paid over to the claimant by the government." 200 U.S. at 20. In addition, in <u>Phillips v. General Services Administration</u>, 924 F.2d 1577 (Fed. Cir. 1991) (per curiam), the United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that a party's agreement to pay her attorney $2500 and "whatever additional fee that might be allowed" to her for his services did not violate the Antiassignment Act. <u>Id.</u> at 1579. The court explained:

> [W]e construe the fee arrangement between [the party] and her attorney to mean that if an award of attorney fees is obtained on her behalf she is obligated to turn it over to her attorney. In this sense, [the party] incurs the attorney fees that may be awarded her. On the other hand, if no fee award is made to her, she does not have any obligation to pay any further fees to her attorney from her own resources. Inherent in the agreement is an intention on the part of [the party] to be obligated to her counsel for fees properly obtainable under the statute.

<u>Id.</u> at 1582-83. And, the United States Court of Federal Claims ("Court of Federal Claims") has distinguished between the assignment of substantive claims and the assignment of any litigation proceeds, holding that the former violates the Antiassignment Act, while the latter does not. <u>First</u>

-16-

<u>Fed. Sav. & Loan Ass'n of Rochester v. United States</u>, 58 Fed. Cl. 139, 156-59 (2003).  Indeed, the court specifically remarked that "[a]rrangements between non-governmental parties concerning payment of litigation costs . . . is a private matter between the parties, not a contravention of the [Antiassignment Act]."  <u>Id.</u> at 157.

The Supreme Court in <u>Ratliff</u> did not overrule the holdings of <u>Nutt</u>, <u>Phillips</u>, or <u>First Federal Savings & Loan</u>, even upon holding that under the EAJA, attorneys' fees and expenses are to be awarded to the prevailing party, and not the party's attorneys.  <u>See</u> 560 U.S. at 591-93. Indeed, after reaching that conclusion, the Supreme Court acknowledged the federal government's continued practice of directing the payment of an EAJA award to a party's attorney when the party does not owe a debt to the United States and has assigned its right to the award to the attorney, but did not address whether the practice would be impermissible under the Antiassignment Act.  <u>Id.</u> at 597-98.  Rather, it noted both "the practical reality that attorneys are the beneficiaries and, almost always, the ultimate recipients of the fees that the statute awards to 'prevailing part[ies],'" and the necessity of "contractual and other assignment-based[] rights that typically confer upon the attorney the entitlement to payment of the fees award the statute confers on the prevailing litigant."  <u>Id.</u> at 598.

Defendant does not address the holdings of <u>Nutt</u>, <u>Phillips</u>, or <u>First Federal Savings & Loan</u>.  Nor does it address the Supreme Court's failure to denounce the common practice of EAJA award assignments in <u>Ratliff</u>.  Rather, defendant relies on an unpublished order from the United States District Court for the District of Arizona in which the court declined to pay an EAJA award directly to the plaintiff's attorney notwithstanding the fact that the plaintiff had assigned her rights to any EAJA award to her attorney.  <u>See</u> <u>Alexander v. Astrue</u>, No. CV11-02465-PHX-DGC, 2012 WL 5989450, at *2-3 (D. Ariz. Nov. 29, 2012).  The court acknowledged that "district courts in other circuits [had] ordered fees paid directly to counsel so long as the government [was] afforded an opportunity to offset any preexisting debt owed by the plaintiff, and the plaintiff [had] assigned all rights in the fee award to counsel."  <u>Id.</u> at *2. Nevertheless, it concluded that the assignment violated the Antiassignment Act.  <u>Id.</u> at *3.

This court is not persuaded that the holding in <u>Alexander</u> is, as defendant contends, applicable in this case.  First, defendant's argument that plaintiffs' fee application is barred by the Antiassignment Act is based solely on plaintiffs' representation that the retention agreements contain "assignment provisions regarding fee awards."  Plaintiffs acknowledge that they "assigned to counsel their interests in the proceeds of any fee awards."  Fee Appl. Reply 7. However, the precise language of the assignment provisions at issue is not before the court, and plaintiffs have not requested, either in their fee application or their supplemental fee application, that the court order any EAJA award be paid directly to their attorneys.  Accordingly, there is no evidence that the assignment provisions do anything more than reflect plaintiffs' agreement that their attorneys are entitled to any award of attorneys' fees and expenses that plaintiffs might receive under the EAJA–a type of agreement that the Antiassignment Act does not forbid.  <u>See</u> <u>Phillips</u>, 924 F.2d at 1582-83; <u>accord</u> <u>Ratliff</u>, 560 U.S. at 597-98.

Second, defendant has acquiesced to plaintiffs' assignment of their rights to an EAJA award to their attorneys. It is well settled that the federal government's recognition of an assignment constitutes a waiver of the Antiassignment Act. See Delmarva Power & Light Co. v. United States, 542 F.3d 889, 893-94 (Fed. Cir. 2008). Such recognition can be expressly stated or inferred from the government's conduct. See Tuftco Corp. v. United States, 614 F.2d 740, 745 (Ct. Cl. 1980); Ins. Co. of the W. v. United States, 100 Fed. Cl. 58, 66 (2011); see also Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."). The Notice of Class Action, which was jointly proposed by the parties and approved by the court in December 2009, reflected that any award of attorneys' fees and expenses would be paid to plaintiffs' attorneys. In other words, defendant was aware that plaintiffs had agreed to assign any award of attorneys' fees and expenses to their attorneys, and rather than object to that provision of the Notice, it acquiesced to the assignment. Therefore, defendant waived the application of the Antiassignment Act.

Finally, none of the purposes of the Antiassignment Act would have been implicated if plaintiffs had requested, pursuant to an assignment agreement, that any EAJA award be paid to their attorneys. In Aetna Casualty & Surety Co. v. United States, the Supreme Court summarized the purposes of the Antiassignment Act:

> Its primary purpose was undoubtedly to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government. Another purpose . . . was to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant.

338 U.S. 366, 373 (1949) (footnote and citation omitted); accord Nutt, 200 U.S. at 20 ("[The Antiassignment Act's] obvious purpose . . . was to forbid anyone who was a stranger to the original transaction to come between the claimant and the government, prior to the allowance of a claim . . . ."); cf. Tuftco Corp., 614 F.2d at 744-45 ("Over time, the courts, sensitive to the purposes of the [Antiassignment Act], exempted from [its] broad reach certain assignments when it was concluded assignment did not present the danger the statutes were designed to obviate."). Plaintiffs' assignment to their attorneys of any EAJA award they might receive raises no danger that third parties–not involved in the underlying dispute–could buy plaintiffs' claims to pursue on their own behalf. Nor would such an assignment result in the multiple payment of claims–because plaintiffs' attorneys worked pro bono, plaintiffs would have no incentive to seek an award of attorneys' fees and expenses after assigning their right to any such award to their attorneys. And, an assignment in these circumstances would not require an investigation of the assignment, since defendant was already aware that plaintiffs intended to assign their rights to an EAJA award to their attorneys.

The court is also not persuaded by defendant's contention that plaintiffs' assignment of their rights to an EAJA award undermines defendant's ability to exercise its right of offset against such an award. As defendant notes, EAJA awards are subject to administrative offset by

the federal government.  See Ratliff, 560 U.S. at 589-90.  Defendant asserts that a "majority of the Sabo plaintiffs" owe money to the federal government, Fee Appl. Resp. 14, "primarily due to the fact that many Sabo plaintiffs received severance pay when they were separated and this payment must be recouped prior to receiving any retirement pay that might be due as a result of the [settlement] agreement," id. at 14 n.5.[14]  As plaintiffs note, however, the recoupment of severance pay is provided for in the settlement agreement, which incorporates the recoupment procedures set forth in DoD 700.14-R.  Therefore, severance pay would not be deducted from any EAJA award.  Additionally, defendant has not identified any other debts owed by the seven named plaintiffs that it would seek to recover from an EAJA award.  Finally, as noted above, plaintiffs have not requested that any EAJA award be paid directly to their attorneys; because any EAJA award would be paid to plaintiffs, defendant could exercise its setoff rights against the award.  Thus, the court cannot conclude that defendant's setoff rights would be adversely affected by plaintiffs' assignment of their rights to an EAJA award to their attorneys.

In sum, plaintiffs' fee application is not barred by the Antiassignment Act.  Accordingly, the court turns its attention to whether the requirements of the EAJA have been satisfied.

## B.  Plaintiffs Are Eligible to Recover Attorneys' Fees and Expenses Under the EAJA

As a threshold matter, plaintiffs must establish their eligibility for an EAJA award.  Specifically, each plaintiff must demonstrate that his or her net worth did not exceed $2,000,000 at the time the lawsuit was filed.  28 U.S.C. § 2412(d)(2)(B).  In their fee application, as supported by sworn declarations, plaintiffs represent that they each had a net worth of less than $2,000,000 at the time this lawsuit was filed.  Indeed, defendant does not dispute that any of the named plaintiffs are ineligible for an EAJA award based on the net worth requirement.  Accordingly, the court concludes that plaintiffs have satisfied the EAJA eligibility requirement.

## C.  Plaintiffs Are Prevailing Parties

In addition to establishing their eligibility for an EAJA award, plaintiffs must demonstrate that they are prevailing parties.  See id. § 2412(d)(1)(A); Davis v. Nicholson, 475 F.3d 1360, 1366 (Fed. Cir. 2007) ("The EAJA applicant has the burden of proving he is a prevailing party.").  "[A] 'prevailing party' is one who has been awarded some relief by the court" that materially alters the legal relationship of the parties.[15]  Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't

---

[14]  Defendant defines "Sabo plaintiffs" as "the named plaintiffs," and not as the entire class.  See Fee Appl. Resp. 2.

[15]  The EAJA contains a definition of "prevailing party," but it relates only to eminent domain proceedings.  See 28 U.S.C. § 2412(d)(2)(H) (explaining that "'prevailing party', in the case of eminent domain proceedings, means a party who obtains a final judgment (other than by settlement), exclusive of interest, the amount of which is at least as close to the highest valuation of the property involved that is attested to at trial on behalf of the property owner as it is to the

of Health & Human Res., 532 U.S. 598, 603-04 (2001); accord id. at 605 (requiring the change in the parties' relationship to have a "judicial imprimatur"); Brickwood Contractors, Inc. v. United States, 288 F.3d 1371, 1378 (Fed. Cir. 2002) (holding that Buckhannon's definition of "prevailing party" applies to the EAJA). Such relief includes an enforceable judgment on the merits, a court-ordered consent decree, "or the equivalent of either of those." Rice Servs., Ltd. v. United States, 405 F.3d 1017, 1025 (Fed. Cir. 2005); accord Buckhannon, 532 U.S. at 604.

Plaintiffs contend that they are prevailing parties by virtue of the court's approval of the parties' settlement agreement in December 2011. Specifically, they note that (1) under the terms of the settlement agreement, all of the class members obtained relief on the merits of their claims; (2) the parties agreed in paragraph thirty-three of the settlement agreement that the terms of the settlement agreement would be adopted as an order of the court; and (3) the court, in its decision approving the settlement, ordered that the settlement agreement be approved and expressly retained jurisdiction over the class members' claims to ensure the settlement's implementation. Defendant disputes plaintiffs' contention that they are prevailing parties, arguing that the relief that plaintiffs obtained was the result of its own voluntary conduct.[16] In particular, it contends:

> [T]he parties voluntarily settled the case, the United States voluntarily changed its practices regarding implementation of the VASRD, the United States voluntarily determined that when effectuating its new policy regarding the application of certain VASRD provisions it would allow corrections board[s] to apply them retroactively, and the United States voluntarily determined that it would apply these new policies to the named plaintiffs and other former service members who met the regulatory provisions.

---

highest valuation of the property involved that is attested to at trial on behalf of the Government").

[16] Defendant also argues that plaintiffs are not prevailing parties because they did not obtain the relief that they sought in their amended complaint–a "permanent disability rating of 50 percent." Fee Appl. Resp. 15. It asserts that plaintiffs describe this relief in paragraphs 62, 73, 87, and 132 of their amended complaint. Each of those paragraphs relates to a separate plaintiff, and contains language substantially similar to the following: "Sgt. Sabo's PTSD was rated at only 10% disability despite the fact that the federal law and the VASRD dictate that a service member, who, like Sgt. Sabo, is found unfit for duty due to PTSD must receive a minimum 50% disability rating." Am. Compl. ¶ 62; accord id. ¶¶ 73 (Nicholas Wells), 87 (Juan Perez), 132 (Tyler Einarson). Similar language for the other three plaintiffs was also included in the amended complaint. See id. ¶¶ 102 (Alan Pitts), 115 (Billy J. Talley), 125 (Aimee Sherrod). None of this language reflects a request for a 50% permanent disability rating. Rather, plaintiffs are averring that they should have received a disability rating in accordance with the VASRD, which requires a six-month 50% disability rating for PTSD.

Fee Appl. Resp. 16.  As a result, asserts defendant, plaintiffs cannot establish that the court materially altered the relationship of the parties when it approved the settlement agreement pursuant to RCFC 23(e) and retained jurisdiction to ensure the settlement's implementation.  In their reply, plaintiffs contend that defendant both misconstrues the significance of the settlement agreement and the controlling precedent, and improperly characterizes the relief they obtained as resulting from voluntary conduct.

Because the court has not issued a judgment on the merits or a consent decree, plaintiffs may be considered prevailing parties only if the court has issued an order that is equivalent to a judgment or consent decree.  Rice Servs., 405 F.3d at 1025.  Plaintiffs do not contend that the court issued an order equivalent to a judgment on the merits.  Thus, the court must determine whether it has issued an order that is equivalent to a consent decree.  A consent decree is a court order that

> embodies an agreement of the parties and thus in some respects is contractual in nature.  But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.

Rufo v. Inmates of the Suffolk Cty. Jail, 502 U.S. 367, 378 (1992).  The court agrees with plaintiffs that the December 22, 2011 Opinion and Order, especially when read in conjunction with the subsequent orders in which the court dismissed the claims of class members who had received relief pursuant to the terms of the settlement agreement, is the functional equivalent of a consent decree.

In its December 22, 2011 Opinion and Order, the court approved the settlement–which provided that each class member would, at a minimum, have his or her military records corrected to reflect a 50% disability rating for PTSD for a six-month period–pursuant to RCFC 23(e).  The court also provided that it would "retain jurisdiction over the claims in [the] case in order to ensure the settlement's implementation." Sabo, 102 Fed. Cl. at 630.  Then, in every order dismissing the claims of class members who had received relief pursuant to the terms of the settlement agreement, the court, at the parties' request and as contemplated in paragraph thirty-three of the settlement agreement ("The terms of this Settlement Agreement are adopted as an order of the Court . . . ."), expressly incorporated the terms of the settlement agreement.  By approving a settlement agreement that required defendant to correct the military records of every class member, and retaining jurisdiction to ensure that the settlement was fully implemented, the court, in essence, awarded relief to plaintiffs that materially altered the parties' legal relationship.[17]  This conclusion is buttressed by the fact that the court incorporated the terms of

---

[17]  This conclusion is supported by case law from other circuits.  See, e.g., Hutchinson v. Patrick, 636 F.3d 1, 9-11 (1st Cir. 2011) (holding that the district court's order approving a settlement agreement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("FRCP") was functionally equivalent to a consent decree because the order altered the parties' legal

the settlement agreement into every order dismissing the claims of class members who had received the relief to which they were entitled pursuant to the agreement.  See Hutchinson, 636 F.3d at 9 (construing the district court's order approving the settlement "in light of both the content of the [Settlement] Agreement itself and its entire context"); Aronov v. Napolitano, 562 F.3d 84, 92 (1st Cir. 2009) (en banc) ("Whether an order contains a sufficient judicial imprimatur

_____

relationship, reflected a "sufficient appraisal of the merits of the purposes of the imprimatur requirement," and indicated that the district court "expressly retained jurisdiction over the case"); id. at 11 n.3 ("[T]he mere fact that a settlement is subject to court approval does not in itself supply the necessary ingredients for prevailing party status.  It is the presence of continuing judicial oversight that pushes the ball across the goal line and thus suffices to give a settlement the required judicial imprimatur."); Davy v. CIA, 456 F.3d 162, 166 (D.C. Cir. 2006) (holding that the court order at issue was "functionally a settlement agreement enforced through a consent decree" because it contained mandatory language, was titled "order," and bore the district court judge's signature); Bell v. Bd. of Cty. Comm'rs, 451 F.3d 1097, 1103 (10th Cir. 2006) ("[I]f a court does not incorporate a private settlement into an order, does not sign or otherwise provide written approval of the settlement's terms, and does not retain jurisdiction to enforce performance of the obligations assumed by the settling parties, the settlement 'does not bear any of the marks of a consent decree' and does not confer prevailing party status on the party whose claims have been compromised." (quoting T.D. v. LaGrange Sch. Dist. No. 102, 349 F.3d 469, 479 (7th Cir. 2003))); T.D., 349 F.3d at 478-79 (agreeing that "some settlement agreements, even though not explicitly labeled as a 'consent decree[,]' may confer 'prevailing party' status[] if they are sufficiently analogous to a consent decree," but holding that the settlement agreement at issue was not sufficiently analogous because it was not "embodied in a court order or judgment," it did not bear "the district court judge's signature," and the district court did not retain jurisdiction to enforce it); Truesdell v. Phila. Hous. Auth., 290 F.3d 159, 165 (3d Cir. 2002) (holding that a court order that (1) "contains mandatory language," (2) "is entitled 'Order,'" (3) "bears the signature of the District Court judge," and (4) gives the plaintiff "the right to request judicial enforcement of the settlement against" the defendant renders the plaintiff a prevailing party); Am. Disability Ass'n v. Chmielarz, 289 F.3d 1315, 1320 (11th Cir. 2002) ("A formal consent decree is unnecessary . . . because the explicit retention of jurisdiction or the court's order specifically approving the terms of the settlement are, for these purposes, the functional equivalent of the entry of a consent decree."); Smyth v. Rivero, 282 F.3d 268, 285 (4th Cir. 2002) ("[T]he judicial approval and oversight identified by the Supreme Court as involved in consent decrees are lacking where, as here, a settlement agreement . . . is neither incorporated explicitly in the terms of the district court's dismissal order nor the subject of a provision retaining jurisdiction.").  But see Christina A. v. Bloomberg, 315 F.3d 990, 993-94 (8th Cir. 2003) (interpreting Buckhannon as requiring "either an enforceable judgment on the merits or a consent decree" and, as a result, holding that the approval of a class action settlement agreement pursuant to FRCP 23(e) "fails to impose the necessary 'imprimatur' on the agreement," that "the district court's approval of the settlement agreement [did] not, by itself, create a consent decree," and that the district court's express retention of jurisdiction to enforce the settlement agreement "alone is not enough to establish a judicial 'imprimatur' on the settlement contract").

can only be determined by determining the content of the order against the entire context before the court."); Smyth, 282 F.3d at 279 (indicating an intent to determine "whether the [settlement] agreement and the district court's order below were, in combination, equivalent to a consent decree"). Given the entirety of the court's proceedings with respect to the settlement agreement, there can be little doubt that the parties' settlement agreement had the necessary judicial imprimatur to satisfy the prevailing party requirement.

Defendant's arguments regarding the voluntary nature of its conduct are misplaced. In any case where the litigants are pursuing a settlement, when a settlement is reached that provides a plaintiff with some relief, the defendant necessarily has voluntarily agreed to provide that relief. If the court does not thereafter issue an order approving the settlement, the plaintiff's lawsuit would be considered merely the catalyst for the defendant's changed conduct, foreclosing the plaintiff's ability to be deemed the prevailing party. See Buckhannon, 532 U.S. at 605 ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change."), 606 ("We cannot agree that the term 'prevailing party' authorizes federal courts to award attorney's fees to a plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the 'sought-after destination' without obtaining any judicial relief."); see also Rice Servs., 405 F.3d at 1026-28 & n.5 (holding that an order in which a court acknowledged an agency's intent to take corrective action, directed the agency to take the corrective action, granted the government's motion to dismiss the lawsuit as moot, and dismissed the lawsuit "without prejudice to the assertion of any new protest action addressed to the remedial action in progress" was not the equivalent of a consent decree, and that the plaintiff's lawsuit merely served as a catalyst for the agency's voluntary change in conduct). However, a plaintiff's lawsuit is more than just a catalyst for the defendant's changed conduct when it results in a court order in which the court expressly approves the parties' settlement agreement and retains jurisdiction to ensure the settlement's implementation. In such circumstances, the lawsuit results in court-ordered relief that materially alters the parties' legal relationship; the voluntary nature of defendant's changed conduct becomes irrelevant.

In sum, plaintiffs have established that they are prevailing parties under the EAJA.

## D.  The Government's Position Was Not Substantially Justified

Once a plaintiff establishes that it is a prevailing party, the burden shifts to the defendant to prove that "the position of the United States was substantially justified . . . ."  28 U.S.C. § 2412(d)(1)(A); see Scarborough v. Principi, 541 U.S. 401, 403 (2004); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1288 (Fed. Cir. 1999).  The "'position of the United States' means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based[.]"  28 U.S.C. § 2412(d)(2)(D). Although a court examines both prelitigation and litigation conduct when evaluating the "position of the United States," id., it "need make only one finding about the justification of that

position," Comm'r, INS v. Jean, 496 U.S. 154, 159 (1990); see also id. ("[O]nly one threshold determination for the entire civil action is to be made.").

For a court to conclude that the government's position was "substantially justified," 28 U.S.C. § 2412(d)(1)(A), the position must be "justified to a degree that could satisfy a reasonable person," Pierce v. Underwood, 487 U.S. 552, 565 (1988); accord id. at 566 n.2 ("[A] position can be justified even though it is not correct, and we believe it can be substantially (i.e., for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact."); see also id. at 566 ("To be 'substantially justified' means . . . more than merely undeserving of sanctions for frivolousness[.]").  Because courts examine "the entirety of the government's conduct" in determining whether "the overall position of the United States" was substantially justified, Chiu v. United States, 948 F.2d 711, 715 (Fed. Cir. 1991), a court may determine that the government's position was not substantially justified if the government's justified conduct is outweighed by its unjustified conduct, see id. at 715 n.4 ("It is for the trial court to weigh each position taken and conclude which way the scale tips . . . ."); accord United States v. $19,047.00 in U.S. Currency, 95 F.3d 248, 252 (2d Cir. 1996) ("[T]he Government's prelitigation conduct or its litigation position could be sufficiently unreasonable by itself to render the entire Government position not 'substantially justified.'" (citing Marcus v. Shalala, 17 F.3d 1033, 1036 (7th Cir. 1994) ("[F]ees may be awarded in cases where the government's prelitigation conduct was not substantially justified even though its litigating position may have been substantially justified and vice versa.  In other words, the fact that the government's litigating position was substantially justified does not necessarily offset prelitigation conduct that was without a reasonable basis."))).[18]

_____

[18]   Indeed, as noted in Jean, the legislative history of the 1985 amendment to the EAJA suggests that a finding of unjustified agency action, even in light of a reasonable litigation position, should lead to the conclusion that the government's position was not substantially justified.  See H.R. Rep. No. 98-992, at 9 (1984) ("[T]he congressional intent is to provide for attorney fees when an unjustifiable agency action forces litigation, and the agency then tries to avoid such liability by reasonable behavior during the litigation."), quoted in Jean, 496 U.S. at 159 n.7; accord Jean, 496 U.S. at 165 ("The 'substantial justification' requirement of the EAJA establishes a clear threshold for determining a prevailing party's eligibility for fees, one that properly focuses on the governmental misconduct giving rise to the litigation.").  However, as explained by the United States Court of Appeals for the Fourth Circuit, the federal courts of appeals have not reached a consensus regarding whether a finding that an agency's prelitigation conduct was not substantially justified requires a finding that the government's position overall was not substantially justified:

> [W]e now turn to the more challenging question of how to assess substantial justification when the government's prelitigation position was unreasonable but its litigation position was reasonable.  For this analysis, we can draw guidance from the views of our sister circuits, who have addressed the question directly, albeit with differing results.  Some have gone as far as stating that a reasonable

Overall, "[w]hether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought."  28 U.S.C. § 2412(d)(1)(B).  Thus, in evaluating whether the government's position was substantially justified, courts should not consider any evidence that was not part of the record before the agency or that was not submitted to the court in conjunction with proceedings on the merits of the parties' claims and defenses.  See Libas, Ltd. v. United States, 314 F.3d 1362, 1366 (Fed. Cir. 2003) (holding that the substantial justification "determination should be based on the record before the trial court, without any additional submissions by the parties"); id. at 1366 n.1 ("The record before the trial court includes not only the actual record, but also . . . any insights which the trial court may have gleaned from settlement conferences or other pretrial activities that are not conveyed by the actual record."); Energy Capital Corp. v. United States, 47 Fed. Cl. 214, 220 (2000) ("Whether a party is entitled to attorneys' fees under Section 2412(d) is determined by examining 'the record . . . which is made in the civil action.'  By this restriction, Congress has instructed trial courts to look for evidence exclusively in the record at trial." (citation omitted)); accord United States v. 1,378.65 Acres of Land, 794 F.2d 1313, 1319 (8th Cir. 1986) (holding that the trial court, in adjudicating an EAJA application, should not have considered evidence that was not before the commission that rendered the underlying decision).  This limitation aligns with the Supreme Court's admonition that an application for attorneys' fees and expenses "should not result in a second major litigation."  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983); see also Patrick v. Shinseki, 668 F.3d 1325, 1333 (Fed. Cir. 2011) ("While resolution of the question of whether to award attorney fees 'should not result in a second major litigation,' a determination as to whether the government's position was substantially justified requires a thorough evaluation of the legal and factual support for the position that it adopted." (citations omitted)).

### 1. The Military's Prelitigation Position Was Not Substantially Justified

The court begins its analysis by evaluating whether the military's failure, prior to October 2008, to apply VASRD § 4.129 to service members deemed unfit for duty due to PTSD was substantially justified.  In contending that the military's prelitigation position was substantially justified, defendant advances three arguments that the court addresses in turn.

---

litigation position can never cure an unreasonable prelitigation stance. . . .  Other circuits have emphasized the importance of the prelitigation position without creating a bright-line rule.

United States v. 515 Granby, LLC, 736 F.3d 309, 315-16 (4th Cir. 2013) (footnote and citations omitted).  The Federal Circuit has not addressed the issue.

### a.  VASRD § 4.129 Was Applicable to the Military Prior to 2008

Defendant first argues that the military's prelitigation position was substantially justified because VASRD § 4.129 was not applicable to the military prior to the enactment of the 2008 NDAA.  In particular, defendant asserts that prior to 2008, Department of Defense and military department regulations provided that "most portions" of the VASRD applied to the military, but that pursuant to 10 U.S.C. § 1216, the Department of Defense and military departments "were authorized to modify certain applications of the VASRD . . . ."  Fee Appl. Resp. 22.  Defendant contends that in accordance with this authority, the Department of Defense declared in paragraph 4.2 of DoDI 1332.39 that the sections of the VASRD that are "internal [VA] procedures or practices" did not apply to the military departments.  According to defendant, VASRD § 4.129 constitutes such an internal VA procedure or practice.

The court rejects defendant's characterization of VASRD § 4.129.  As an initial matter, defendant disregards the plain language of the relevant statutory provisions governing the separation and retirement of service members with at least thirty days of active duty service who are deemed unfit for duty–10 U.S.C. §§ 1201-1203.  Under these statutory provisions, the determination of whether a service member should be separated, placed on the TDRL, or retired depends, in part, on the disability rating assigned to the service member "under the standard schedule of rating disabilities in use by the [VA] at the time of the determination."  10 U.S.C. §§ 1201(b)(3)(B), 1203(b)(4)(A)-(C); accord id. § 1202 (incorporating the standard set forth in 10 U.S.C. § 1201).  In other words, pursuant to these statutory provisions, the military departments are required to use the VASRD when assigning disability ratings to service members deemed unfit for duty.[19]  Accord McHenry v. United States, 367 F.3d 1370, 1378-79 (Fed. Cir. 2004) (noting that 10 U.S.C. §§ 1201 and 1204 require that disability ratings "be based on the VASRD").  Moreover, none of these statutory provisions includes an exception to the use of the VASRD.  In light of the statutory mandate and the absence of any statutory exceptions, the military departments are precluded from creating an exception through regulation,

---

[19]  The 2008 NDAA reinforces the conclusion that the military departments were obligated to use the VASRD when assigning disability ratings to service members deemed unfit for duty.  In the that Act, Congress added a new section to chapter 61 of title 10 of the United States Code–§ 1216a–that provided:  "In making a determination of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned . . . shall, to the extent feasible, utilize the schedule for rating disabilities in use by the [VA] . . . ."  10 U.S.C. § 1216a(1).  This language is substantially similar to the language that already existed in other provisions of chapter 61.  See, e.g., id. § 1201(b) (indicating that a Secretary of a military department must determine that "the disability is at least 30 percent under the standard schedule of rating disabilities in use by the [VA] at the time of the determination").  Thus, § 1216a(1) was reiterating an existing obligation, not creating a new one.

notwithstanding their authority to promulgate regulations to implement the statutory provisions.[20] See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 & n.9 (1984) (holding that if the intent of Congress is clear from the language of the statute, then the court and the agency must give effect to that intent); Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32 (1981) ("[Courts] must reject administrative constructions of the statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement."). Thus, while the Secretaries of the military departments have "all powers, functions, and duties incident to the determination" of service members' "percentage of disability," 10 U.S.C. § 1216(b), and are authorized to issue regulations bearing on such determinations, id. § 1216(a), they cannot issue regulations precluding the use of the ratings set forth in the VASRD.

Indeed, paragraph 4.2 of DoDI 1332.39 reflects the Department of Defense's understanding that the military departments are required to use the ratings set forth in the VASRD. That paragraph specifically provides that "Chapter 61 of [10 U.S.C.] establishes the [VASRD] as the standard for assigning percentage ratings." It then differentiates the provisions of the VASRD that contain such ratings from the provisions that contain policies, procedures, and practices applicable only to the VA, indicating that the latter provisions are not applicable to the military departments. According to defendant, VASRD § 4.129 is not a disability rating, but is instead an internal VA procedure or practice that is not applicable to the military departments. Defendant is mistaken, for two reasons.

First, defendant misapplies paragraph 4.2 of DoDI 1332.39–which provides that the portions of the VASRD "that refer to internal [VA] procedures or practices" are not applicable to the military departments–to VASRD § 4.129. As set forth above, VASRD § 4.129 provides:

> When a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about the veteran's release from active military service, the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the six month period following the veteran's discharge to determine whether a change in evaluation is warranted.

38 C.F.R. § 4.129. On its face, this provision neither constitutes nor refers to an internal VA procedure or practice.

---

[20] In Haskins v. United States, the court held that "[n]othing in 10 U.S.C. § 1201 prohibits the Army from applying its own regulations as a guide to . . . rating physical disabilities." 51 Fed. Cl. 818, 825 (2002); see also O'Neil v. United States, 6 Cl. Ct. 317, 321 (1984) ("It is clear from the Department [of Defense]'s enunciated policy that the VA schedules are not to be strictly construed, but are to be used as a guide in determining the individual's impairment in earning capacity in civil occupations resulting from his disease(s)."). The court did not conclude, as defendant implies, that the military departments could, through regulation, alter the statutory mandate to use the VASRD when rating service members' disabilities.

Second, contrary to defendant's assertion, VASRD § 4.129 does mandate a particular disability rating:  it requires rating agencies to assign at least a 50% disability rating when a service member is deemed unfit for duty due to traumatic stress.  Indeed, VASRD § 4.129 appears to be a minimum rating–a type of VASRD disability rating that the military has embraced.  See DoDI 1332.39, ¶ 6.10.2 ("In some instances the VASRD provides a 'minimum rating' without qualifications as to residuals or impairment.  Diagnosis alone is sufficient to justify the minimum rating. . . .  Although higher ratings may be awarded in consonance with degree of severity, no rating lower than the 'minimum' may be used if the diagnosis is satisfactorily established.").  Thus, the fact that the 50% disability rating mandated by VASRD § 4.129 is not based on the severity of a service member's PTSD does not, as defendant suggests, disqualify VASRD § 4.129 from constituting a disability rating.[21]

In sum, because the military departments were required by statute to apply the VASRD when assigning disability ratings, and because VASRD § 4.129 constitutes a disability rating and not an internal VA procedure or practice, VASRD § 4.129 was applicable to the military prior to the enactment of the 2008 NDAA.

## b.  VASRD § 4.129 Is Not a Convalescent Rating

Defendant next argues that the military's prelitigation position was substantially justified because the military reasonably considered VASRD § 4.129 to be analogous to a convalescent rating, a type of rating that the Department of Defense deemed inapplicable to the military departments' rating of service member disabilities.  Defendant's argument lacks merit.

As noted above, the Department of Defense's rejection of convalescent ratings is set forth in paragraph 6.7 of DoDI 1332.39:

> Under certain diagnostic codes, the VASRD provides for a convalescent rating to be awarded for specified periods of time without regard to the actual degree of impairment of function.  SUCH RATINGS DO NOT APPLY TO THE MILITARY DEPARTMENTS.  Convalescence will ordinarily have been completed by the time optimum hospital improvement (for disposition purposes) has been attained.  If not, rate according to the manifest impairment.

---

[21]  Plaintiffs contend that the 50% disability rating mandated by VASRD § 4.129 is based on the severity of a service member's PTSD, relying on the provision's reference to the PTSD being "severe enough to bring about the veteran's release from active military service . . . ."  However, a PTSD diagnosis can lead to a service member's separation from active duty regardless of the severity of the PTSD.  Thus, the 50% disability rating mandated by VASRD § 4.129 is not tied to the actual severity of a service member's PTSD.

However, neither the Department of Defense nor the military departments have issued regulations characterizing VASRD § 4.129 as a convalescent rating.[22]  Moreover, even if the military had done so, such a characterization is belied by the plain language of the VASRD.

As described in VASRD § 4.30, a convalescent rating is a 100% total disability rating assigned without regard to other provisions of the VASRD when treatment for a disability resulted in (1) "[s]urgery necessitating at least one month of convalescence"; (2) "[s]urgery with severe postoperative residual[]" effects; or (3) "[i]mmobilization by cast, without surgery," of at least one major joint.  38 C.F.R. § 4.30.  VASRD § 4.129 neither requires a 100% total disability rating nor concerns a disability that requires treatment with surgery or a cast.  Further, the portion of the VASRD related to mental disorders includes a section expressly dealing with convalescent ratings, separate and distinct from VASRD § 4.129, which describes a convalescent rating for a mental disorder as a 100% total disability rating "due to a continuous period of hospitalization lasting six months or more . . . ."  Id. § 4.128.  As previously noted, VASRD § 4.129 does not require a 100% total disability rating.  Nor does VASRD § 4.129 contain a hospitalization requirement.  And finally, unlike VASRD § 4.30 and VASRD § 4.128, VASRD § 4.129 does not refer–either generally or with particularity–to convalescent ratings.  In short, there is no support for defendant's contention that VASRD § 4.129 constitutes a convalescent rating.

### c. Plaintiffs' Alleged Waiver of Their Right to Judicial Relief Is Irrelevant

Finally, defendant argues that the military's prelitigation position was substantially justified because plaintiffs waived their right to judicial relief by not challenging the military's failure to apply VASRD § 4.129 before an informal PEB, a formal PEB, or an appropriate administrative review board.  However, plaintiffs' purported failure to preserve their rights to challenge the military's practice in federal court has no bearing on whether that practice was justified in the first instance.  In other words, the fact that plaintiffs or other similarly situated individuals did not challenge the military's practice of not applying VASRD § 4.129 to service members deemed unfit for duty due to PTSD does not mean that the military was substantially justified in that practice–the practice could constitute an unreasonable violation of the relevant statutes regardless of whether it was challenged.  Accordingly, defendant's waiver argument lacks merit.

---

[22]  Although the Army issued substantially identical policy memoranda in 2002 and 2005 declaring VASRD § 4.129 to be a convalescent rating, such internal memoranda lack the force of law and are therefore not entitled to deference.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000).  Instead, the interpretations contained in the policy memoranda "are 'entitled to respect' . . . , but only to the extent that those interpretations have the 'power to persuade.'"  Id. (citation omitted).  As set forth below, the declaration that VASRD § 4.129 is a convalescent rating is contrary to statute and regulation.  Accordingly, the 2002 and 2005 policy memoranda lack persuasive value.

### d.  Defendant Has Not Established That the Military's Prelitigation Position Was Substantially Justified

To sum up, the court has rejected each of the arguments presented by defendant in support of its contention that the military's prelitigation position was substantially justified. Contrary to defendant's arguments, VASRD § 4.129 was applicable to the military prior to the enactment of the 2008 NDAA, VASRD § 4.129 is not a convalescent rating, and plaintiffs' purported waiver of their rights to challenge the military's practice of not applying VASRD § 4.129 to service members deemed unfit for duty due to PTSD is irrelevant.  Because defendant has not suggested any other grounds for establishing that the military's failure to apply VASRD § 4.129 to qualifying service members was substantially justified, it fails to meet its burden.  The court therefore concludes that the military's prelitigation position was not substantially justified.

### 2.  Although Defendant's Decision to Pursue a Settlement Was Substantially Justified, Defendant Has Not Satisfied Its Burden of Proof With Respect to Other Litigation Positions

Defendant's failure to establish that the military's prelitigation position was not substantially justified does not, however, end the court's inquiry.  The court must also determine whether defendant's litigation positions were substantially justified.

As recounted above, after plaintiffs filed their complaint on December 17, 2008, defendant proposed administrative procedures and policy changes to resolve plaintiffs' claims. While the parties discussed defendant's proposal, plaintiffs filed an amended complaint and the court certified the case as a class action.  Defendant did not file an answer to the complaint or amended complaint.  By December 18, 2009, the parties reached an agreement regarding the procedure for resolving plaintiffs' and the class members' claims.  The court stayed proceedings to allow the parties to implement their agreement.  However, plaintiffs became dissatisfied with the pace of implementation.  Therefore, on January 28, 2011, they filed a motion to lift the stay of proceedings and a motion for summary judgment.  The court lifted the stay shortly thereafter and defendant, rather than responding to plaintiffs' summary judgment motion, re-engaged plaintiffs in settlement discussions.  At the parties' request, the court stayed proceedings on March 24, 2011, and then, on July 15, 2011, the parties filed their proposed settlement agreement.  The court approved the settlement agreement on December 22, 2011.  Full implementation of the settlement was delayed, leading plaintiffs to file motions for judicial enforcement of the settlement on February 6, 2013, and March 14, 2013.  Defendant did not respond to these motions but instead worked with plaintiffs to reach a resolution.  Eventually, class members began to obtain the relief to which they were entitled under the settlement agreement and on May 9, 2013, the court began to dismiss the claims of the class members who had obtained such relief.

Defendant identifies three factors in support of its contention that its litigation position was substantially justified.  First, defendant notes that it agreed to settle the case "in the interest

of achieving swift care for veterans with PTSD and the related desire for judicial economy," and that providing plaintiffs with appropriate relief required adjudication by a corrections board because "[n]o Court could order the relief that those Boards could." Fee Appl. Resp. 26. Second, defendant asserts that due to the Department of Defense's decision to retroactively apply VASRD § 4.129 to all service members discharged after September 11, 2001 (as reflected in a July 17, 2009 memorandum), plaintiffs were already entitled to the relief set forth in the settlement agreement, but were able to obtain that relief in a more expeditious manner. Third, defendant remarks that it had several valid defenses to plaintiffs' claims, including the defense that plaintiffs waived their rights to judicial review, and therefore would have prevailed on the merits absent a settlement.

Plaintiffs disagree that defendant's litigation position was substantially justified. In their fee application, they contend that the parties' original agreement provided for an expedited review of all class member applications by the PDBR and BCMRs, but that defendant did not allocate sufficient resources for such an expedited review despite its promises to do so, derailing the agreed-to process. Ultimately, as reflected in the court-approved settlement agreement, the parties decided on a process in which no class member was required to apply to the PDBR or a BCMR to obtain relief. As a result, plaintiffs assert, they needlessly expended enormous resources in preparing, processing, and filing PDBR and BCMR applications for plaintiffs and the class members. Further, in their reply in support of their fee application, plaintiffs contend that defendant is incorrect, as a matter of law, in asserting that the court could not provide them with their requested relief, and that, in fact, the court-approved settlement agreement did not require adjudication by the PDBR or the BCMRs. Plaintiffs also argue that consideration of defendant's waiver argument would impermissibly require the court to consider evidence outside of the existing record, and that in any event, they could have successfully resisted any motion to dismiss.

Before the court can determine whether defendant's litigation position was substantially justified, it must first answer the question, "What was defendant's litigation position?" Notably, it is not possible to ascertain defendant's litigation position with respect to the merits of plaintiffs' claims. Defendant did not file an answer in response to either of plaintiffs' complaints and therefore did not admit or deny any of plaintiffs' allegations or articulate any affirmative defenses. The parties did not file a joint preliminary status report, a document that might have reflected defendant's position. And, defendant neither filed a response to plaintiffs' motion for summary judgment nor filed its own dispositive motion. It was not until defendant filed its response to plaintiffs' fee application that it advanced a position on the merits of plaintiffs' claims by describing the defenses it would have offered had it chosen to do so.[23] Defendant's

_____

[23] The court notes that during the June 12, 2009 status conference, defendant described some of the "issues" implicated in this case. See Status Conference Tr. 7-8, 26. In particular, defendant represented that it was examining whether plaintiffs waived their claims by not requesting review by a formal PEB, the effect of the Army's guidance to its PEBs that VASRD § 4.129 should not be used when assigning disability ratings for PTSD, and whether 10 U.S.C. §

description of its possible defenses comes too late.  Because defendant did not formally take a position on the merits of plaintiffs' claims prior to the resolution of those claims via settlement, the court cannot evaluate whether defendant's position on the merits of plaintiffs' claims–including whether defendant possessed a valid defense–was substantially justified.

Although defendant never formally took a position on the merits of plaintiffs' claims, it did take other actions that can be evaluated by the court.  Defendant proposed administrative procedures and policy changes to resolve plaintiffs' claims and worked with plaintiffs to reach an agreement with respect to that proposal.  Then, when plaintiffs objected to the pace at which defendant was implementing the agreement by seeking to lift the stay of proceedings and filing a motion for summary judgment, defendant re-engaged plaintiffs in settlement discussions, which resulted in a court-approved settlement agreement.  Finally, when plaintiffs lodged objections to the implementation of the settlement agreement, defendant worked with plaintiffs to resolve the issues.  All of these actions constitute reviewable litigation positions.

Defendant contends that its decision to pursue a settlement with plaintiffs was substantially justified, and the court agrees.[24]  Indeed, given that the military was always obligated to apply VASRD § 4.129 to service members deemed unfit for duty due to PTSD and that it began to apply VASRD § 4.129 prospectively to service members in October 2008 and retrospectively to former service members in July 2009, it was in both defendant's and plaintiffs'

---

1558 constituted an exhaustion requirement.  Id. at 10-12, 26-27.  However, defendant never formally raised these issues as defenses.

[24]  In contrast, the court does not agree with defendant's contention that the court was precluded from ordering the correction of plaintiffs' military records in the absence of an adjudication from the PDBR or a BCMR.  It is well settled that resort to a correction board is a permissive action, not a mandatory requirement.  See Antonellis v. United States, 723 F.3d 1328, 1333 (Fed. Cir. 2013) ("[T]here is generally no requirement that a plaintiff exhaust remedies with the applicable Corrections Board before filing suit in the Claims Court . . . ."); Martinez v. United States, 333 F.3d 1295, 1304 (Fed. Cir. 2003) (en banc) ("[S]ince their creation, the correction boards have been regarded as a permissive administrative remedy and that an application to a correction board is therefore not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge.").  Further, the Court of Federal Claims is fully authorized to direct the correction of military records in conjunction with a monetary judgment.  See 28 U.S.C. § 1491(a)(2) ("To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States."); Roth v. United States, 378 F.3d 1371, 1375-76 (Fed. Cir. 2004) (finding "no error" with the Court of Federal Claims ordering the correction of a number of the plaintiff's military records).  Finally, as plaintiffs note, the court-approved settlement agreement provides for the correction of the class members' military records without resort to the PDBR or a BCMR.

interests to achieve a settlement. However, defendant does not respond to plaintiffs' contention, with respect to the parties' initial agreement, that it did not live up to its representations that the PDBR and the BCMRs would process class member applications in an expeditious manner. By failing to address this contention, defendant cannot meet its burden of establishing that the actions it took to implement the parties' initial agreement to resolve plaintiffs' and the class members' claims were substantially justified. See, e.g., Libas, Ltd., 314 F.3d at 1364 ("[T]he trial court can consider the government's failure to submit evidence as an admission that its position was not substantially justified and so state in its opinion."); Trump v. Colvin, No. 12 C 6194, 2015 WL 970111, at *2 (N.D. Ill. Mar. 2, 2015) ("The Commissioner does not meet her burden simply by reciting case law and general legal principles without addressing any of the facts of this case and without offering any argument as to why her position in this case was substantially justified."); Khoury v. Astrue, No. 04 C 5452, 2010 WL 5110103, at *1 (N.D. Ill. Dec. 8, 2010) ("In failing even to address [the argument], the Commissioner cannot meet his burden to demonstrate that his position was substantially justified."); Sisul v. Astrue, No. 08-cv-4044, 2010 WL 271727, at *1 (C.D. Ill. Jan. 14, 2010) ("Where the government has put on no evidence or argument that its position was 'substantially justified,' it cannot be said that it has carried this burden."), cited in Martinez v. United States, 94 Fed. Cl. 176, 186 (2010); San Luis Valley Ecosys. Counsel v. U.S. Forest Serv., No. 04-cv-01071-MSK, 2009 WL 792257, at *3 (D. Colo. Mar. 23, 2009) ("Without meaningful argument . . . , the Court cannot find that the [defendant] has carried its burden of showing that its litigation position was substantially justified."). In short, the court concludes that defendant's decision to pursue a settlement with plaintiffs was substantially justified, but that defendant fails to meet its burden of establishing that the actions it took to implement the parties' initial agreement to resolve plaintiffs' and the class members' claims administratively were substantially justified.

### 3. The Government's Overall Position Was Not Substantially Justified

Having determined that the military's prelitigation position was not substantially justified, that defendant's decision to pursue a settlement was substantially justified, and that defendant did not satisfy its burden of proof with respect to its efforts to implement the parties' original agreement to resolve plaintiffs' and the class members' claims, the court must determine whether, in light of "the entirety of the government's conduct," Chiu, 948 F.2d at 715, "the position of the United States was substantially justified," 28 U.S.C. § 2412(d)(1)(A); accord Jean, 496 U.S. at 159 (holding that a court "need make only one finding about the justification of [the United States'] position"). In making this determination, the court must evaluate the reasonableness of each of the government's positions. See $19,047.00 in U.S. Currency, 95 F.3d at 252; Marcus, 17 F.3d at 1036; Chiu, 948 F.2d at 715 n.4. After duly evaluating the government's positions, the court finds that the military's failure to apply VASRD § 4.129 to service members deemed unfit for duty due to PTSD–both before and after the enactment of the 2008 NDAA–despite the statutory requirement to do so was sufficiently unreasonable as to outweigh defendant's fully justified decision to pursue a settlement with plaintiffs, especially in light of defendant's failure to establish that its efforts to implement the parties' original agreement were substantially justified. Indeed, as explained by the Federal Circuit, "[w]here . . .

-33-

the government interprets a statute in a manner that is contrary to its plain language . . . , it will prove difficult to establish substantial justification."  Patrick, 668 F.3d at 1330-31.  The court therefore concludes that the government's overall position was not substantially justified.

### E.  There Are No Special Circumstances Making an Award of Attorneys' Fees and Expenses Unjust

Even though defendant has not established that the government's position was substantially justified, the court cannot award plaintiffs attorneys' fees and expenses if "special circumstances make an award unjust."  28 U.S.C. § 2412(d)(1)(A).  Defendant bears the burden of establishing the existence of such special circumstances.  Devine v. Sutermeister, 733 F.2d 892, 896 (Fed. Cir. 1984), superseded on other grounds by statute, Pub. L. No. 99-80, § 2(c)(2)(B), 99 Stat. 183, 185 (1985) (codified at 28 U.S.C. § 2412(d)(2)(D)), as recognized in Doty v. United States, 71 F.3d 384, 385-86 (Fed. Cir. 1995).  What might constitute a special circumstance precluding an award of attorneys' fees and expenses is not explained in the EAJA.  However, an explanation appears in the EAJA's legislative history:

> [T]he Government should not be held liable where "special circumstances would make an award unjust."  This "safety valve" helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts.  It also gives the court discretion to deny awards where equitable considerations dictate an award should not be made.

H.R. Rep. No. 96-1148, at 11 (1980), quoted in Devine, 733 F.2d at 895-96; see also Air Transp. Ass'n of Canada v. FAA, 156 F.3d 1329, 1333 (D.C. Cir. 1998) ("With the scant guidance of the sparse legislative language and the snippet of history, courts have generally held that the statutory language expresses a congressional directive for courts 'to apply traditional equitable principles' in determining whether a prevailing party should receive a fee award under EAJA."); Greenhill v. United States, 96 Fed. Cl. 771, 778 (2011) ("Courts look to equitable principles such as the doctrine of 'unclean hands' in determining whether there are special circumstances that would make an EAJA award unjust.").

Defendant does not identify any special circumstances that would make an award of attorneys' fees and expenses unjust in this case.  And, the court does not discern the presence of any special circumstances–defendant was not attempting to advance a "novel but credible extension[] and interpretation[] of the law," and there are no "equitable considerations" foreclosing an award of attorneys' fees and expenses.  Accordingly, the court concludes that plaintiffs, having satisfied all of the EAJA's requirements, are entitled to an award of attorneys' fees and expenses.

## IV.  THE AMOUNT OF ATTORNEYS' FEES AND EXPENSES AWARDED TO PLAINTIFFS

Having concluded that an EAJA award is proper in this case, the court must determine the precise amount of attorneys' fees and expenses to which plaintiffs are entitled.  See 28 U.S.C. § 2412(d)(1)(A) (providing that "a court shall award . . . fees and other expenses" if the statutory requirements are satisfied).  Under the EAJA,

> "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.)[.]

Id. § 2412(d)(2)(A).  This list of recoverable fees and expenses is not exclusive.  Oliveira v. United States, 827 F.2d 735, 744 (Fed. Cir. 1987).  Rather, the court has the discretion to award the "reasonable and necessary expenses of an attorney incurred or paid in preparation for trial of the specific case before the court, which expenses are those customarily charged to the client where the case is tried."  Id.; accord Hensley, 461 U.S. at 437 (holding that the trial court "has discretion in determining the amount of a fee award").

To determine the amount of "reasonable attorneys fees," 28 U.S.C. § 2412(d)(2)(A), "[t]he most useful starting point . . . is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," Hensley, 461 U.S. at 433.  This initial amount should be reduced by "hours that were not 'reasonably expended,'" such as "excessive, redundant, or otherwise unnecessary" hours.  Id. at 434 (quoting S. Rep. No. 94-1011, at 6 (1976)).  Then, the court may "adjust the fee upward or downward" based upon other considerations.  Id.  One important consideration is the results obtained by the prevailing party; courts "should focus on the significance of the overall relief obtained by the [prevailing party] in relation to the hours reasonably expended on the litigation."  Id. at 434-35.  As explained in Hensely:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. . . .  In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in

> the lawsuit.  Litigants in good faith may raise alternative legal grounds for a
> desired outcome, and the court's rejection of or failure to reach certain grounds is
> not a sufficient reason for reducing a fee.  The result is what matters.

Id. at 435 (citation omitted).

In determining the amount of allowable expenses, a court "must use its discretion, in view of the record before it, to determine whether a specific expense may be recovered by the" prevailing party.  Oliveira, 827 F.2d at 744.  The "expenses of an attorney that are not incurred or expended solely or exclusively in connection with the case before the court, or which expenses the court finds to be unreasonable or unnecessary in the pending litigation, cannot be awarded under the EAJA."  Id.

The prevailing party bears the burden of supporting its application for attorneys' fees and expenses with documentation that will enable an evaluation of the reasonableness of its request. See Hensley, 461 U.S. at 437; Owen v. United States, 861 F.2d 1273, 1275 (Fed. Cir. 1988) (per curiam).  "Sufficient documentation requires 'contemporaneous records of exact time spent on the case, by whom, their status and usual billing rates, as well as a breakdown of expenses such as the amounts spent copying documents, telephone bills, mail costs and other expenditures related to the case.'"  Cmty. Heating & Plumbing Co. v. Garrett, 2 F.3d 1143, 1146 (Fed. Cir. 1993) (quoting Naporano Iron & Metal Co. v. United States, 825 F.2d 403, 404 (Fed. Cir. 1987)); see also Hensley, 461 U.S. at 437 n.12 (noting that time records should "identify the general subject matter of [the] time expenditures," but need not reflect "in great detail how each minute . . . was expended").  If the documentation is inadequate, the court "may reduce the award accordingly."  Hensley, 461 U.S. at 433.

### A.  Plaintiffs' Attorneys

When they filed this lawsuit, plaintiffs were ably represented by Brad Fagg from Morgan Lewis and Barton F. Stichman from the NVLSP.  Mr. Fagg is a partner in Morgan Lewis's litigation department who has practiced law for more than twenty years.  Mr. Stichman is joint executive director of the NVLSP, an independent nonprofit veterans service organization, who has practiced law since 1975.  Attorneys from Morgan Lewis and the NVLSP–including Mr. Fagg and Mr. Stichman–were appointed as class counsel by the court on September 29, 2009. During the pendency of this litigation, Mr. Fagg was assisted by more than fifteen attorneys from Morgan Lewis and Mr. Stichman was assisted by eleven attorneys and a law clerk at the NVLSP. The attorneys from Morgan Lewis and the NVLSP have represented plaintiffs and the class pro bono.

**B. Plaintiffs' Fee Application**

In their fee application, plaintiffs request reimbursement for attorneys' fees and expenses incurred through October 31, 2011, for the work performed by attorneys from Morgan Lewis and the NVLSP. Their attorneys engaged in the following activities during that time:

- Initial research regarding identification and selection of, as well as initial consultations with, appropriate class representatives, and research and drafting of both the original and First Amended Complaints;

- Research and drafting class allegations, including preliminary approval of the class and drafting the notice to putative class members;

- Negotiation with the Government on its proposal to provide relief through the use of the [PDBR] and the individual military service branches' [BCMRs], including negotiating details of the administrative process, drafting revised PDBR and BCMR application forms, and finalizing terms of Memorandum of Understanding with Government;

- Provide resources and counseling to putative class members regarding the application process to these various review boards, including preparation of training materials and actual training of attorneys providing advice and counsel;

- Analyze cases of putative class members not identified by the Government, resulting in identification of over 100 additional putative class members;

- Respond to thousands of calls from the over 4,400 putative class members with individualized legal advice and answers to question regarding process;

- Draft different sets of written legal advice, depending on the individual class member's situation, about which military review board to apply to, and how best to pursue relief on the merits;

- Monitor progress of opt-in process, including tracking and documenting 2,176 opt-ins and hundreds of undeliverable legal notices for use in Status Reports and notice to Government;

- Research, and counseling regarding, various military benefits effected by proposed class relief, including effects of glitch in statutory calculation formula for Combat-Related Special Compensation;

- Respond to thousands of calls from among the 2,176 opted-in class members about the interim administrative process and status of lawsuit, as well as training to pro bono attorneys from corporate partners to help with same;

- Continued monitoring and data administration of military review board decision process, including reviewing sufficiency of, and correcting errors in, over 1,200 applications received by class counsel for review before submission to the various review board[s];

- Development and update of litigation website for putative class members;

- Periodic search of Government web portal for new military review board decisions, and follow-up analysis of over 600 decisions to provide legal advice to class members and information to the Court through Status Reports;

- Research and preparation of motion to lift stay;

- Research and preparation of motion for summary judgment;

- Negotiations with Government counsel to resolve case, including drafting the final settlement agreement and the motion for preliminary approval of class action litigation;

- Research to determine the appropriate placement of class members in the nine discrete subgroups created for purposes of settlement;

- Research for inclusion with legal notice of the settlement agreement the individualized information for each of the 2,176 distinct Disclosure Statements;

- Respond to hundreds of individual class member inquiries regarding the Settlement Agreement and impact on them; and

- Numerous appearances at Court status hearings, as well as preparation and filing of numerous joint status reports.

Fee Appl. Ex. 2 at ¶ 6, Ex. 3 at ¶ 5.  For this work, plaintiffs request $498,414.74 in attorneys' fees and $12,161.37 in expenses charged by Morgan Lewis, and $1,467,303.16 in attorneys' fees and $43,403.33 in expenses charged by the NVLSP.  They represent that during the relevant time period, the attorneys at Morgan Lewis typically billed at hourly rates between $235 to $825, and although the NVLSP does not have billable rates, the prevailing market rates for its attorneys' services ranged from $225 to $475 per hour.  Because these hourly rates exceed the maximum

hourly rate permitted under the EAJA, plaintiffs seek reimbursement for attorneys' fees at the statutory rate of $125 per hour with adjustments for increases in the cost of living. The adjusted hourly rates requested by plaintiffs are $176.25 for 2008, $177.86 for 2009, $180.92 for 2010, and $186.57 for 2011.

Defendant raises three objections to plaintiffs' fee application. First, it argues that because the military was "acting in accordance with the applicable law and regulations" until July 1, 2008, plaintiffs' claim should be reduced to "exclude fees related to all plaintiffs whose PEB determinations were made" prior to that date. Fee Appl. Resp. 30. Based on the number of months that the military was purportedly acting properly relative to the time period at issue in this lawsuit, defendant avers that plaintiffs' claim should be reduced by 93%. Defendant's second objection relates to the $11,574.37 in attorneys' fees claimed for "preparing for press conferences and other media related matters," which defendant asserts are not allowable. Id. at 31. Third, defendant notes a series of duplicate billing entries in Morgan Lewis's supporting documentation, resulting in an overcharge of $21,678.75.

In their reply in support of their fee application, plaintiffs acknowledge the accuracy of defendant's latter two objections and accordingly reduce their request for attorneys' fees and expenses by $33,253.12. With respect to defendant's first objection, plaintiffs contend that "prior to the filing of this lawsuit, the government never acted in compliance with 'applicable law and regulation'" because the military did not, as required, apply VASRD § 4.129 when assigning disability ratings to service members deemed unfit for duty due to PTSD. Fee Appl. Reply 46. As explained above, the court agrees with plaintiffs. The military was statutorily required to apply VASRD § 4.129 when a service member was deemed unfit for duty due to PTSD both before and after the enactment of the 2008 NDAA. Accordingly, the court declines to reduce plaintiffs' claim for attorneys' fees and expenses by 93% as defendant requests.

The court finds that the attorneys' fees and expenses requested by plaintiffs in their fee application, as amended, were reasonable and necessary to pursue this litigation. Accordingly, the court awards plaintiffs $1,988,029.48 for attorneys' fees and expenses incurred through October 31, 2011, for the work performed by attorneys from Morgan Lewis and the NVLSP.

## C.  Plaintiffs' Supplemental Fee Application

In their supplemental fee application, plaintiffs request reimbursement for attorneys' fees and expenses incurred for the work performed by Morgan Lewis and the NVLSP from November 1, 2011, through January 15, 2015. During that time period, their attorneys engaged in the following activities:

A.  Prepare motions, engage in communications with government representatives, perform research, and take other steps to enforce settlement agreement with respect to categories of class members, as well as individual class members;

B.  Extensive communications with government personnel regarding
    interpretation and enforcement of the Settlement Agreement;

C.  Research, including individualized research and factual investigation,
    regarding impacts and elections for large numbers of class members;

D.  Respond to hundreds and hundreds of calls from class members with
    individualized legal advice and answers to questions regarding process and
    impacts;

E.  Research, and counseling regarding, various military benefits effected by
    proposed class relief, including effects of glitch in statutory calculation
    formula for Combat-Related Special Compensation;

F.  Tracking and monitoring of individual relief, and follow-up analysis to
    provide legal advice to class members and information to the Court through
    Status Reports; and

G.  Research and prepare EAJA fee application and briefing in response to
    opposition to same.

Suppl. Fee Appl. Ex. 1 at ¶ 5, Ex. 2 at ¶ 5.  For this work, plaintiffs request $209,883.60 in
attorneys' fees and $3795.13 in expenses charged by Morgan Lewis, and $1,619,449.74 in
attorneys' fees and $41,766.58 in expenses charged by the NVLSP.  Plaintiffs represent that
during the relevant time period, the attorneys at Morgan Lewis typically billed at hourly rates
between $410 to $825, and the prevailing market rates for NVLSP's attorneys' services ranged
from $240 to $520 per hour.  However, to conform to the EAJA's hourly rate provision,
plaintiffs instead seek reimbursement for attorneys' fees at the adjusted hourly rates of $186.57
for 2011, $191.08 for 2012, $194.00 for 2013, and $196.70 for 2014 and 2015.  In total, plaintiffs
seek reimbursement for 9,630.9 hours of work by their attorneys.

Defendant opposes plaintiffs' supplemental fee application, arguing that plaintiffs have
not provided sufficient supporting detail that would permit defendant to evaluate whether the
claimed hours were reasonably expended.[25]  It explains that the bulk of the claimed hours relate

---

[25]  In addition to this argument, defendant, in footnote two of its response to plaintiffs'
supplemental fee application, states its belief that plaintiffs' supplemental fee application is
untimely for the same reasons it presented in its motion to dismiss plaintiffs' fee application.
The court is not obligated to address arguments set forth in footnotes.  See SmithKline Beecham
Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[A]rguments raised in footnotes
are not preserved.").  Nevertheless, the court notes that Judge Miller rejected defendant's
arguments in his May 1, 2013 Opinion and Order, holding that "[b]ecause there has been no final
judgment in this case, plaintiffs' application for fees, expenses, and costs was not filed after the

to monitoring the implementation of the parties' settlement, and that without sufficient detail regarding the work actually performed, it is not possible to determine whether such work was necessary to monitor the settlement's implementation. In fact, defendant represents that it had advised plaintiffs' attorneys that it considered some of their postsettlement activities to be beyond the scope of what was necessary to implement the settlement. Defendant also contends that the number of hours claimed by plaintiffs–over four hours per class member by its calculation–is excessive in relation to the work that should have been required to implement the parties' settlement. To remedy the purported deficiencies in plaintiffs' supplemental fee application, defendant suggests that the court reduce plaintiffs' claim for attorneys' fees and expenses by at least 50%.

The parties agree that courts have awarded attorneys' fees and expenses for monitoring and enforcing consent decrees and similar judgments. See, e.g., Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 561 (1986) (concluding that the activities of the respondent's attorneys were "crucial to the vindication of [the respondent's] rights under the consent decree" and that "compensation for these activities was entirely proper"); see also Binta B. v. Gordon, 710 F.3d 608, 623-25 (6th Cir. 2013) (describing a split in the federal circuit courts regarding whether, post-Buckhannon, attorneys' fees and expenses are allowable for monitoring and enforcement activities that do not result in additional court-ordered relief[26]). In addition, there is no dispute that such attorneys' fees and expenses, as with all other fees and expenses, are reimbursable only to the extent that they are reasonable and necessary. See Ass'n for Retarded Citizens of N.D. v. Schafer, 83 F.3d 1008, 1011 (8th Cir. 1996) (citing Hensley, 461 U.S. at 424).

As defendant notes, an application for attorneys' fees and expenses must be supported by documentation sufficiently detailed to permit an evaluation of the reasonableness and necessity of the claimed fees and expenses. See Hensley, 461 U.S. at 437; Owen, 861 F.2d at 1275. To satisfy this requirement, plaintiffs submitted (1) statements containing itemized billing entries that included the name of the attorney who performed the work, the date the work was

---

expiration of the thirty-day deadline of § 2412(d)(1)(B)." Sabo v. United States, No. 08-899C, 2013 WL 11330882, at *5 (Fed. Cl. May 1, 2013). There remains no final judgment in this matter.

[26] The United States Courts of Appeals for the Eighth, Ninth, and Tenth Circuits have concluded, post-Buckhannon, that attorneys' fees and expenses are allowable for monitoring and enforcement activities that do not result in additional court-ordered relief. See Binta B., 710 F.3d at 623-24. The United States Court of Appeals for the Seventh Circuit has held to the contrary. Id. at 624. In Binta B., the United States Court of Appeals for the Sixth Circuit concluded that to be compensable, "work spent defending or enforcing a decree must result in a court order or agency determination that at least 'secure[s] [plaintiffs'] initial success in obtaining the consent decree' . . . ." Id. at 625 (quoting Del. Valley Citizens' Council for Clean Air, 478 U.S. at 558). The Federal Circuit has not addressed this issue.

performed, the amount of time required to perform the work, and a description of the work performed; (2) spreadsheets summarizing the number of hours of work performed and the hourly rates for that work; and (3) spreadsheets identifying the expenses incurred.  This documentation, plaintiffs contend, is sufficiently specific to "satisfy the applicable standards," and reflects that "the nature of the efforts for which costs are claimed are comfortably recoverable[.]"  Suppl. Fee Appl. Reply 2.  The court agrees.

As an initial matter, the court notes that although defendant contends that plaintiffs' documentation–the itemized billing entries in particular–lack sufficient detail, it does not identify any specific billing entry that describes nonallowable work or is inappropriately vague.  Rather, defendant merely states, without support, that "[a] majority of the entries in plaintiffs' submitted billing statements simply note that plaintiffs' counsel 'contact[ed]' or 'communicat[ed]' with 'Sabo plaintiffs.'"  Suppl. Fee Appl. Resp. 2-3.  However, a review of the documentation submitted by plaintiffs does not reveal any–much less a majority–of billing entries that "simply note" a communication with a plaintiff.  Instead, the billing entries that reflect a communication with a plaintiff or class member indicate the reason for the communication.  See, e.g., Suppl. Fee Appl. Ex. 2, Attach. A at 194 ("Call Sabo class members in response to their survey responses indicating difficulties encountered in obtaining settlement benefits in order to obtain additional information and attempt to resolve their benefits problems."), 238 ("Communicate with Sabo class members experiencing difficulty accessing settlement agreement benefits in order to advise the class members on resolving those problems."), 562 ("Took hotline calls from class members [with] concerns and complaints about the government's implementation of the Settlement Agreement and class members' ability to access settlement benefits; update hotline log and attorney notes re: same.").[27]  Moreover, it appears to the court from its review of all of the billing entries that each one contains descriptions of both the action that was taken and the reason for the action.  The billing entries therefore provide sufficient detail to enable an evaluation of the reasonableness and necessity of the claimed attorneys' fees and expenses.  Accord Beta Sys., Inc. v. United States, 866 F.2d 1404, 1406 (Fed. Cir. 1989) ("[The time sheets submitted by the plaintiff] are typical billing records, showing time and charges, a description of the work done, and by whom.  The accounting comports with the statutory and case law for such records.").

Plaintiffs indicate that the work described in their supplemental fee application includes preparation of their applications for attorneys' fees and expenses, work accomplished prior to the court's approval of the parties' settlement agreement, activities required by court order or the settlement agreement, and activities related to postsettlement monitoring and enforcement.  In the latter two categories, plaintiffs identify the following ten activities (the first four required by court order or the settlement agreement and the final six related to monitoring and enforcement):

1. Notifying 522 class members listed on exhibits D, F, H, or K of their right under the settlement agreement to make an election regarding relief,

---

[27] Attachment A is not separately paginated.  Thus, the court uses the page numbers assigned by its electronic case filing system.

answering their questions and providing advice about their elections, and
notifying the government of the elections ultimately made.

2. Notifying the 53 class members listed on exhibit L of their opportunity to
   obtain permanent military disability retirement benefits under the settlement
   agreement by pursuing a VA claim, answering their specific questions, and
   monitoring the results of their VA claims.

3. Activities related to implementation of settlement agreement ¶ 26.

4. Preparation of joint status reports.

5. Activities related to government failure to correct military records by the
   settlement agreement deadline.

6. Activities related to the government's inaccurate correction of the military
   records of more than 350 class members.

7. Activities related to plaintiffs' 2013 motion for judicial enforcement of
   settlement agreement to address government delay in determining the amount
   of money it owed as a result of the settlement agreement to 950 class members
   listed on exhibits F, G, H, and K.

8. Activities related to plaintiffs' second enforcement motion to address
   government delay in determining the amount of money it owed as a result of
   the settlement agreement to 1,050 class members listed on exhibits C and D.

9. Monitoring activities following plaintiffs' two enforcement motions.

10. Responding to thousands of inquiries from many class members about the
    government's implementation of the settlement agreement.

Suppl. Fee Appl. Reply 5-16.  For each of these categories, plaintiffs explain the work performed
by their attorneys.  They also provide examples of relevant billing entries for all but two of the
categories.[28]

---

[28]  Plaintiffs did not cite examples of billing entries for the categories related to their
motions for judicial enforcement of the settlement agreement.  However, billing entries for these
categories are readily discernable.  See, e.g., Suppl. Fee Appl. Ex. 1, Attach. A at 18
("Teleconference with M. Hogan re motion to enforce."), 24 ("Review draft motion to enforce
settlement agreement, supporting declaration; prepare note re: distribution; review research re:
court authority; review negotiation history of settlement; revise draft papers.").

As noted above, defendant does not challenge the propriety of any particular billing entry. In addition, defendant does not argue that any of the activities identified by plaintiffs–as reflected in the individual billing entries–are not the types of activities for which plaintiffs can recover attorneys' fees and expenses, notwithstanding the fact that it clearly recognized from reviewing the billing entries that many of the activities relate to the implementation of the settlement.[29] Based on its review of plaintiffs' supporting documentation, the court finds that the work performed by plaintiffs' attorneys in conjunction with the parties' implementation of the settlement, along with the other work described in the supplemental fee application, was reasonable and necessary for plaintiffs to obtain the relief to which they were entitled under the settlement agreement.  In addition, because there is no evidence that the number of hours expended on these tasks was unreasonable, a reduction of compensable hours is unwarranted.

In sum, the attorneys' fees and expenses requested by plaintiffs in their supplemental fee application were reasonable and necessary to pursue this litigation.  The court therefore awards plaintiffs $1,874,895.05 for attorneys' fees and expenses incurred from November 1, 2011, through January 15, 2015, for the work performed by attorneys from Morgan Lewis and the NVLSP.[30]

## V.  CONCLUSION

As set forth above, the court finds that plaintiffs have satisfied the requirements of the EAJA.  They are eligible to receive an award of attorneys' fees and expenses, they are prevailing parties, defendant's position was not substantially justified, and there are no special circumstances precluding an award.  In addition, the attorneys' fees and expenses requested by plaintiffs were incurred for work that was reasonable and necessary for them to obtain relief. Accordingly, plaintiffs are awarded $3,862,924.53 for attorneys' fees and expenses incurred for the work performed by attorneys from Morgan Lewis and the NVLSP.  The clerk shall enter judgment on plaintiffs' applications for attorneys' fees and expenses.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[29]  Defendant merely represents that it advised plaintiffs' attorneys that it considered some of their postsettlement activities to be beyond the scope of what was necessary to implement the settlement.  This representation–unsupported by declaration, documentary evidence, or citations to previous filings with the court–is facially insufficient to counter plaintiffs' contention that the activities described in their supplemental fee application are compensable.

[30]  Plaintiffs have waived any rights to seek reimbursement for fees and expenses incurred after January 15, 2015.